GRACE J. BERGEN (SBN #114649)
ANGELA L. DIESCH (SBN # 256253)
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709
bergeng@gtlaw.com
diescha@gtlaw.com

Attorneys for Plaintiff
PATRIOT RAIL CORP.

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRIOT RAIL CORP., a Delaware corporation,<br><br>　　　　Plaintiff,<br><br>v.<br><br>SIERRA RAILROAD COMPANY, a California corporation,<br><br>　　　　Defendant. | CASE NO.<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br>　1)　**Breach Of Contract;**<br>　2)　**Breach of Implied Covenant of Good Faith and Fair Dealing;**<br>　3)　**Intentional Interference With Prospective Economic Advantage;**<br>　4)　**Negligent Interference With Prospective Economic Advantage;**<br>　5)　**Fraud & Misrepresentation;**<br>　6)　**Coercion;**<br>　7)　**Federal Unfair Competition and Common Law Violations; and**<br>　8)　**Unfair Competition- California Business & Professions Code §17200**<br><br>DATE:<br>TIME:<br>DEPT:<br>JUDGE:<br>TRIAL: |

SAC 444 254 202

1  Plaintiff PATRIOT RAIL CORP. ("Patriot") by and through its counsel,

2  Greenberg Traurig, LLP, as and for its complaint against Defendant Sierra Railroad

3  Company ("Sierra"), alleges the following:

**PARTIES**

5  1.  Plaintiff Patriot is a corporation organized and incorporated under the

6  laws of the State of Delaware with its principal place of business in Boca Raton,

7  Florida.

8  2.  Defendant Sierra is a corporation organized and incorporated under the

9  laws of the State of California with its principal place of business in Davis, California.

**JURISDICTION AND VENUE**

11  3.  This Court has jurisdiction of the claims alleged herein under 28 U.S.C.

12  Section 1332(a)(1). Diversity of citizenship exists between the parties, and the amount

13  of the controversy, exclusive of interest and costs, exceeds $75,000.

14  4.  Venue is appropriate in the Eastern District under 28 U.S.C. § 1391(a)

15  because the defendant has its principal place of business within the Eastern District of

16  California and a substantial portion of the events or omissions giving rise to Patriot's

17  claims occurred in this judicial district. See <u>Decker Coal Co. v. Commonwealth Edison</u>

18  <u>Co.</u>, 805 F.2d 834, 842 (9th Cir. 1986) (place of performance, not place of repudiation,

19  is appropriate venue for breach-of-contract action).

**GENERAL ALLEGATIONS**

21  5.  Patriot is a short line and regional freight railroad holding company which

22  operates short line freight railroads in North America.

23  6.  Sierra operates, through its wholly-owned subsidiary Sierra Northern

24  Railway, freight hauling, switching, and car storage on approximately 88 miles of track

25  in California.

26  7.  At all times mentioned in this complaint, Michael G. Hart was acting as

27  an officer and director of Sierra and in doing the things described in this complaint, was

28  acting under such agency and employment.

1    8.    McClellan Park ("MP"), located at the former McClellan United States

2  Air Force base in the Sacramento region, is a rail-served industrial park for which Sierra

3  operated rail switching services until and through February 29, 2008.

4    9.    As early as 2005, Patriot Rail, LLC's then Executive Vice President,

5  Matthew Devine, and Sierra's President and Chief Executive Officer, Michael G. Hart,

6  began to discuss the potential for an acquisition of Sierra. Patriot Rail, LLC is a parent

7  company of Patriot.

8    10.    On or around September 29, 2005, Patriot Rail, LLC and Sierra entered

9  into a non-disclosure agreement (the "NDA"). The NDA provided, in part, as follows:

10      Sierra Northern Railroad Company…is prepared to furnish to Patriot Rail,
        LLC…certain financial, technical, and other information which the
11      Company regards as highly confidential and sensitive in connection with a
        possible acquisition of the Company by Patriot Rail (the "Transaction")….
12
        "Confidential Information" does not include information that (1) was
13      available to the public prior to the time of disclosure, (2) becomes available
        to the public through no act or omission by Patriot Rail, or (3) becomes
14      available to Patriot Rail on a non-confidential basis from a third party not
        known or reasonably suspected by Patriot Rail to be under any obligation of
15      confidentiality to the Company with respect thereto.

16    11.    After Patriot Rail, LLC's review of the minimal information provided by

17  Sierra at that time, no offer was made for a purchase and the parties ceased discussions.

18    12.    In April 2007, new discussions began between Sierra and Patriot whereby

19  the parties explored the possibility of Patriot's purchase of Sierra. However, again, only

20  minimal financial information was provided by Sierra for Patriot's review, including

21  only a draft financial statement for the 2006 fiscal year.

22    13.    At approximately the same time period, Sierra's executives sought a long-

23  term extension of Sierra's MP contract, and met with executives at MP in May 2007 to

24  discuss Sierra's desire to expand its operations there.

25    14.    In June of 2007, Michael Hart informed Patriot that Sierra was concerned

26  about the services it provided at MP and that Sierra believed it was in jeopardy of losing

27  the MP contract. Mr. Hart specifically requested that Patriot assist Sierra in trying to

28  maintain the customer. Patriot agreed to offer such assistance.

15.   In June 2007, Patriot informed Sierra that the financial information previously provided by Sierra was not sufficient for Patriot to make an offer to purchase Sierra; and thereafter Patriot requested Sierra's audited 2006 and unaudited 2007 interim financial statements.

16.   Around this same time, Patriot agreed to work with Sierra toward pursuing and obtaining a long-term license agreement with MP. Toward this goal, on or around July 10, 2007, Sierra arranged a meeting with Gary Hunter, a director on Sierra's board, Deborah Compton of MP, and several employees of Patriot. The purpose of the meeting was for Sierra to introduce Patriot to MP in order to improve the chances that MP would extend the existing license agreement if Patriot purchased Sierra.

17.   During the period of July 18 through August 13, 2007, Patriot and Sierra exchanged email correspondence regarding general financial data and valuations in furtherance of reaching an agreement for Patriot's acquisition of Sierra.

18.   In August 2007, with the direct knowledge of Gary Hunter, a director on Sierra's board, Patriot met with MP as a follow up to the July 10, 2007 meeting. At that meeting, MP indicated that it would not renew the license with Sierra based upon their past performance.

19.   On August 31, 2007, MP informed Sierra that it was pursuing a formal request for a proposal from multiple short line operators, including Sierra. MP also notified Sierra that it chose to exercise its right to terminate the Railroad License on six months notice, with the termination election effective September 1, 2007 and the six (6) month period expiration on February 29, 2008.

20.   On information and belief, Patriot alleges that MP chose to terminate the Railroad License with Sierra as a result of Sierra's poor performance during their prior term of the Railroad License agreement.

21.   On September 5, 2007, MP sent Patriot a letter advising that Patriot, as well as three other companies, California Northern Railroad, Portland & Western

1 Railroad, Inc. and Sierra, were selected to respond to a formal request for proposal

2 ("RFP") for the rail opportunity at McClellan.

3     22.     It is Patriot's belief that MP included Sierra in the RFP process only to

4 ensure continued rail operations until February 29, 2008.

5     23.     Patriot made a formal offer to purchase Sierra on September 10, 2007.

6 Sierra rejected said offer and discussions were put on hold.

7     24.     In reliance on Sierra's representations that Patriot needed to secure the

8 long term license with MP, Patriot submitted a proposal responding to the RFP for MP

9 in anticipation of formalizing Patriot's acquisition of Sierra. The basis for Patriot's

10 proposal to MP was the information provided to Patriot by MP, which was the same

11 information provided to the other bidders.

12     25.     During the months of October, November, and December 2007, Sierra did

13 not communicate with Patriot about either the postponed negotiations or about MP's

14 October 2007 RFP. Patriot, therefore, reasonably relied on Sierra's prior

15 representations and assumed that Sierra expected Patriot to respond to MP's RFP, in

16 furtherance of securing a long-term railroad license.

17     26.     In January 2008, MP informed Patriot that it had won the bid for the MP

18 contract and immediately thereafter Patriot began negotiating with MP for a License

19 Agreement.

20     27.     Also in January 2008, discussions between Patriot and Sierra were

21 reinstituted regarding Patriot's potential acquisition of Sierra. The negotiations,

22 however, were slow because Michael Hart repeatedly threatened Patriot with litigation

23 and resulting harm to Patriot's reputation if an agreement could not be reached on his

24 terms to acquire Sierra. On information and belief, these threats were intended to

25 induce Patriot to pay more than Sierra was worth and to accept a contract without the

26 customary representations, warranties, and certifications.

27     28.     On or around February 27, 2008, MP and Patriot entered into a Railroad

28 License Agreement for services at McClellan. The License Agreement required Patriot

**1** to invest up to one million dollars ($1,000,000.00) in infrastructure at the business park

**2** and to pay a substantial monthly rental for up to 20 years.

**3**     29.     Despite the repeated threats and obstacles imposed by Sierra, the

**4** negotiations between Patriot and Sierra continued through February 2008. Even though

**5** Sierra had lost the MP license, Patriot agreed to include the historic EBITDA of Sierra,

**6** derived from MP, as part of the formula for determining the purchase price.

**7**     30.     On February 28, 2008, Sierra, by way of an email from Michael Hart,

**8** agreed to a one million dollar ($1,000,000.00) price reduction to Patriot's purchase

**9** price to compensate Patriot for the required one million dollar ($1,000,000.00)

**10** investment for rail expansion at McClellan as contemplated by the Patriot-MP Railroad

**11** License Agreement. Additionally, the draft letter of intent included in the email also

**12** showed that the adjusted earnings before interest, taxes, depreciation and amortization

**13** ("EBITDA") included "all revenues generated by railroad operations by either party at

**14** McClellan Business Park."

**15**     31.     On March 6, 2008, however, Sierra and Michael Hart unilaterally changed

**16** the agreed upon purchase price credit from one million dollars to five hundred thousand

**17** dollars ($500,000.00).

**18**     32.     On March 14, 2008 Patriot sent a final revised letter of intent to Sierra. On

**19** March 17, 2008 Michael Hart wrote to Patriot rejecting the March 14, 2008 letter of

**20** intent and again threatening to file a lawsuit against Patriot.

**21**     33.     Unbeknownst to Patriot, Sierra instituted a lawsuit against Patriot on

**22** March 14, 2008. The lawsuit, however, was dismissed without prejudice by Sierra after

**23** Patriot agreed to enter into a Letter of Intent on March 20, 2008 ("March 20 LOI"). A

**24** true and correct copy of the March 20 LOI is attached and incorporated by reference

**25** herein as Exhibit A. The March 20 LOI provided, in pertinent part, the following:

**26**

**27**     1. (a) Purchaser will acquire, at its option, either all of the assets comprising
          [Sierra's] freight business and operations, or 100% of the common and

**28**     other equity interests of Sierra and any of its subsidiaries conducting freight
          business and operations, for a purchase price of seven (7) times Audited
          Adjusted EBITDA for 2007....

(f) The parties acknowledge that…the Purchaser has not been given access to [Sierra's] financial statements for 2007, and that such information has not been audited. Accordingly, the Purchase Price is dependent upon 2007 audited adjusted recurring EBITDA (excluding "one-time" revenues and expenses other than those specifically identified…below ("Audited Adjusted EBITDA") for all freight operations, as outlined….[F]or the purposes of calculating [the] Audited Adjusted EBITDA, no reductions shall be made for income derived from the sale of locomotives, the loss from the Sierra line, or the loss of McClellan Business Park.

34.     The March 20 LOI did not include the $500,000 downward adjustment of Sierra's purchase price as previously agreed to by the parties prior to Sierra's instigation of the March 14, 2008 lawsuit.

35.     On June 24, 2008 Sierra provided Patriot with a draft audit of Sierra's 2007 financial statements.

36.     At the time of signing the March 20 LOI, Michael Hart and Sierra failed to disclose the substantial amount of $225,000.00 of one-time income earned by Sierra in 2007 from the scrapping of the Clarksburg line, which line would no longer be able to generate revenue in the future.

37.     Michael Hart and Sierra also failed to disclose the substantial revenue and income derived from construction activities, not directly related to running a short line freight railroad.

38.     Sierra and Hart also failed to disclose to Patriot the poor condition of much of Sierra's track lines, and that ownership of six (6) miles of track passes to the California State Railroad Museum upon closing of the line.

39.     Patriot, in an effort to negotiate in good faith, did not ask to reverse the construction income from EBITDA, nor did Patriot ask for a reduction in purchase price for track repairs or for track not actually owned by Sierra.

40.     The items addressed in paragraphs 36, 37, 38, and 39 above were all discovered by Patriot in the process of due diligence.

41.     Michael Hart insisted the one-time revenue of the scrapping of the Clarksburg line must be included in EBITDA, even though said revenue resulted from the abandonment of a property specifically omitted from Exhibit B of the March 20

1  LOI.

2      42.    On July 14, 2008, Patriot in good faith and in contemplation that all
3  outstanding issues with Sierra could be resolved, filed with the Surface Transportation
4  Board for approval of the acquisition of the Sierra lines, which approval became
5  effective  thirty (30) days later.

6      43.    On or around August 13, 2008 a telephonic conference call took place
7  among representatives and counsel, for Sierra and Patriot regarding negotiating the
8  differences that Patriot had with Sierra on the acquisition terms.  The major differences
9  were identified as a) Patriot's non-acceptance of $225,000.00 of scrap revenue in the
10  2007 EBITDA for purposes of calculating the purchase price, and b) Sierra's objections
11  to the track access agreements.

12      44.    On the scrap issue, while scrap is generally part of the profits and losses
13  for freight railroads, of the $225,000.00 objected to by Patriot, approximately 95% of
14  the scrap was generated from the abandonment of one rail line, the Clarksburg line,
15  which was specifically excluded from the acquisition deal, and thus not relevant to
16  Sierra's continuing freight EBITDA, as it was non-recurring. Abandoning a line is a one
17  time event.

18      45.    To resolve the differences regarding the scrap, the parties agreed that
19  Sierra would transfer to Patriot unused track maintenance or other tax credits of $1.4
20  million, thus substantially offsetting the scrap issue, which amounted to $1,575,000.00
21  ($225,000.00 times the seven (7) multiplier used in the purchase price).  If after analysis
22  it was found that the tax credits were less than $1.4 million, there would be a dollar-for-
23  dollar reduction in the purchase price.  Sierra again unilaterally and in bad faith
24  subsequently lowered the agreed upon amount to $1,053,000.00.

25      46.    With regard to the track access agreement issues, Sierra insisted on
26  retaining a permanent right to operate tourist trains on the track Patriot was to acquire
27  virtually at-will, with terms dictated by Sierra.  Patriot believed that operation of the
28  tourist trains should not, as provided in the March 20 LOI, "unreasonably interfere with

1 the schedule or the safety of Purchaser's freight operations."

2 47. To resolve the differences regarding the track access agreements, Michael

3 Hart of Sierra, insisted that Patriot purchase the tourist operations. Patriot had no

4 intention or desire to purchase the tourist operations; however, in good faith, Patriot

5 agreed to purchase it for the net liquidation value ("NLV") and sell them off after the

6 acquisition. The parties further agreed that Patriot would have the assets appraised at

7 net liquidation value, and if the portion of the NLV of the assets that Patriot would

8 receive (i.e. less the selling costs and 50% share of the real estate proceeds to Sierra)

9 was less than $2.2 million, then the purchase price would be reduced on a dollar-for-

10 dollar basis. Also, Patriot would have an outside accountant audit the costs actually

11 incurred to ensure that if the $300,000.00 of revenue from the tourist operations ceased,

12 the expenses would also cease. If the expenses were not eliminated, again the purchase

13 price would be reduced on a dollar for dollar basis.

14 48. On the basis of the agreements reached during the August 13, 2008

15 conference call, there appeared to be no major unresolved issues to prevent the

16 acquisition from proceeding.

17 49. During the next few months, the parties exchanged numerous drafts of

18 purchase agreements, had numerous telephone calls and emails trying to reach a final

19 agreement. Sierra and Michael Hart continued to threaten Patriot with a lawsuit, and

20 make changes in the terms that Patriot believed to have been previously agreed upon.

21 50. On December 19, 2008, Patriot sent an execution copy of the Stock

22 Purchase Agreement which Patriot was prepared to execute and which, on information

23 and belief, consisted of all terms previously negotiated and agreed to by the parties.

24 51. On December 22, 2008, Michael Hart claimed Patriot failed to satisfy

25 "two things to close this deal: (1) convince [Michael Hart] that [Patriot] would close this

26 transaction, and (2) show [Sierra] that [Patriot] would treat [Sierra] fairly regarding

27 future real estate sales." Based on these two identified items Sierra refused to execute

28 the Stock Purchase Agreement.

Patriot Rail Corp. Complaint

SAC 111 351 202

52.    The reasons given, however, were not good cause to refuse to execute the Stock Purchase Agreement, which encompassed all previously negotiated terms, including Patriot's agreement to pay Sierra the first $500,000.00 of cash received on the sale of Sierra line real estate, as well as Patriot's promise to make commercially reasonable efforts to sell certain real estate.

53.    In yet another display of bad faith, subsequent interim financial statements provided by Sierra showed that Sierra sold more than $170,000.00 worth of assets in violation of the March 20 LOI. Again in good faith, Patriot did not request a reduction of the purchase price.

## FIRST CAUSE OF ACTION

### Breach of Contract

54.    Patriot realleges and fully incorporates by reference herein paragraphs 1 through 53 of this complaint.

55.    Patriot signed the March 20 LOI in justifiable reliance upon representations made by Michael Hart and Sierra that Sierra would negotiate in good faith with Patriot for the acquisition of Sierra.

56.    Patriot signed the March 20 LOI in justifiable reliance upon specific representations made by Michael Hart and Sierra regarding the value of Sierra's EBIDTA and other specific representations set forth above.

57.    Sierra violated the March 20 LOI by negotiating in bad faith, by making false and inaccurate representations, by insisting Patriot acquire assets not contemplated by the LOI, and by failing to execute the Stock Purchase Agreement as agreed to under the terms of the March 20 LOI.

58.    Sierra further violated the March 20 LOI by refusing to compromise the value of the EBITDA formula for the one-time scrap revenue that resulted from the abandonment of the Clarksburg line.

59.    Sierra is estopped from denying the binding nature of the terms of the

1  March 20 LOI based upon its false representations, omissions, and bad faith conduct.

2      60.    As a result of Sierra's breaches and bad faith conduct, Patriot has been

3  damaged in an amount exceeding $75,000.00 to be proven at trial.

4      61.    As a result of Sierra's breaches, bad faith conduct, and threats in writing

5  by Sierra and Michael Hart, Patriot will be irreparably harmed in its good will and

6  reputation unless the court orders Sierra to execute the Stock Purchase Agreement

7  pursuant to the negotiated terms of the March 20 LOI.

8

9              **SECOND CAUSE OF ACTION**

10      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

11      62.    Patriot realleges and fully incorporates by reference herein paragraphs 1

12  through 61 of this complaint.

13      63.    Patriot and Sierra were parties to the terms and agreements as alleged

14  above, into which the law implies a covenant of good faith and fair dealing.

15      64.    This covenant requires that each party to an agreement act with fairness

16  and good faith to each other, and that neither party should take any action to prevent the

17  other from reaping the benefits of the agreement.  The covenant further requires Sierra

18  to refrain from acts which cause monetary damage to Patriot.

19      65.    Patriot is informed and believes and therefore alleges that in doing the acts

20  and omissions alleged above, Sierra unfairly interfered with the right of Patriot to

21  receive the benefit of the March 20 LOI by, inter alia, failing to negotiate in good faith,

22  failing to execute the Stock Purchase Agreement under the agreed upon terms of the

23  March 20 LOI, insisting without compromise that one-time scrap revenue be included in

24  the EBITDA, and insisting in contravention of the March 20 LOI that Patriot purchase

25  Sierra Entertainment, the tourist rail division of Sierra.

26      66.    Sierra has breached the covenant of good faith and fair dealing implied in

27  the parties agreement by taking the actions described hereinabove.

28      67.    As a result of the above wrongful conduct of Sierra, Patriot has suffered

SAC 111 251 202

1  damages in an amount to be proved at trial.

2      68.    Further, Patriot has incurred and continues to incur necessary and

3  reasonable legal fees and other costs as a direct result of the wrongful actions of Sierra

4  as described herein.

5

6                        **THIRD CAUSE OF ACTION**

7      **Intentional Interference With Prospective Economic Advantage**

8      69.    Patriot realleges and fully incorporates by reference herein paragraphs 1

9  through 68 of this complaint.

10     70.    Patriot secured and developed a relationship with MP at the behest of

11 Sierra.

12     71.    Sierra knew or reasonably should have known that Patriot only entered

13 into the railroad license agreement with MP in anticipation of acquiring Sierra and

14 based upon specific representations by Sierra that the procurement of a long-term

15 railroad license agreement was vital to the future economic success of the rail lines to be

16 acquired by Patriot from Sierra.

17     72.    Sierra has intentionally, maliciously, and in bad faith obstructed and

18 delayed negotiations with Patriot for the purchase of Sierra.

19     73.    Sierra has repeatedly threatened and caused reputational harm to Patriot

20 and prevented Patriot from fully realizing the benefit of the MP railroad license

21 agreement as contemplated by Sierra and Patriot, evidenced by Sierra's insistence that

22 Patriot secure a long-term license agreement with MP.

23     74.    As a proximate result of Sierra's wrongful conduct, Patriot has suffered

24 economic and reputational harm.

25     75.    Sierra's conduct was willful, fraudulent, oppressive and malicious.  As

26 such, Patriot is entitled to exemplary or punitive damages sufficient to punish Sierra for

27 its bad faith conduct.

28     76.    Further, Patriot has incurred and continues to incur necessary and

Patriot Rail Corp. Complaint

SAC 111 254 203

1 reasonable legal fees and other costs as a direct result of the wrongful actions of Sierra
2 as described herein.

3     77.     As a direct and proximate result of Sierra's intentional interference with
4 Patriot's prospective economic advantage, Patriot has suffered, and will continue to
5 suffer, monetary damages and irreparable injury.

6     78.     Based upon the intentional, willful, and malicious nature of Sierra's
7 actions, Patriot is entitled to recover exemplary damages and reasonable attorneys' fees
8 and costs incurred in connection with the action.

9

10                                **FOURTH CAUSE OF ACTION**

11            **Negligent Interference With Prospective Economic Advantage**

12     79.     Patriot realleges and fully incorporates by reference herein paragraphs 1
13 through 78 of this complaint.

14     80.     Sierra has negligently and in bad faith interfered with Patriot's acquisition
15 of Sierra.

16     81.     Sierra knew or reasonably should have known that Patriot only entered
17 into the Railroad License Agreement with MP in anticipation of acquiring Sierra, based
18 upon Sierra's representations that the procurement of a long-term railroad license
19 agreement was vital to the future economic success of the rail lines to be acquired by
20 Patriot from Sierra.

21     82.     As a direct and proximate result of Sierra's negligent conduct, Patriot has
22 suffered economic damages.

23     83.     Patriot has incurred and continues to incur necessary and reasonable legal
24 fees and other costs as a direct result of the negligent conduct actions of Sierra as
25 described herein.

26     84.     As a direct and proximate result of Sierra's negligent interference with
27 Patriot's prospective economic advantage, Patriot has suffered, and will continue to
28 suffer, monetary damages and irreparable injury.

Case No. "Type Case No"

Patriot Rail Corp. Complaint

SAC 111 251 202

1

2

## FIFTH CAUSE OF ACTION

3

### Fraud, Deceit and Misrepresentation

4      85.    Patriot realleges and fully incorporates by reference herein paragraphs 1

5  through 84 of this complaint.

6      86.    On or about March 20, 2008 Patriot agreed to enter into a letter of intent

7  to purchase Sierra based upon, inter alia, the EBITDA formula which was represented

8  by Michael Hart and Sierra to be an accurate reflection of the financial status of Sierra

9  and future prospects of Sierra.

10      87.    As further alleged above, Michael Hart and Sierra made intentional and

11  negligent representations that were false, and when Sierra made these representations,

12  they knew of the falsity of the representations and made the representations with the

13  intent to deceive Patriot.

14      88.    At the time Patriot entered into the March 20 LOI described above, Patriot

15  did not know of the falsity of the representations described above, and believing them to

16  be true, relied on these representations in deciding to enter into good faith negotiations

17  to acquire Sierra. Had Patriot known the truth of the representations, it would not have

18  entered into the March 20 LOI nor the negotiations to purchase the McClellan

19  acquisition.

20      89.    Patriot is informed and believes that Sierra and Michael Hart have delayed

21  and drawn out the negotiations for the acquisition of Sierra in bad faith, with the intent

22  to coerce Patriot into paying additional money for the purchase of Sierra, and in

23  contradiction to the representations that time was of the essence for the parties.

24      90.    As a direct result of the intentional and negligent misrepresentations and

25  fraud of Michael Hart and Sierra, Patriot has suffered economic and reputational

26  damages, and harm to its good will, in an amount to be proven at trial.

27      91.    The aforementioned conduct of Sierra was an intentional

28  misrepresentation, deceit, or concealment of material fact known to Sierra, with the

SAC 111 251 202

1  intention on the part of Sierra to deprive Patriot of money, and was despicable conduct

2  that subjected Patriot to unfair and unjust hardship with conscious disregard of Patriot's

3  rights, and constituted oppression, fraud, and/or malice so as to justify an award of

4  punitive damages.

5

6  ## SIXTH CAUSE OF ACTION

7  ### Coercion

8  92.    Patriot realleges and fully incorporates by reference herein paragraphs 1

9  through 91 of this complaint.

10  93.    Through its own due diligence, Patriot discovered that, in addition to the

11  misrepresentations and deceit set forth above, Sierra falsely included certain assets in

12  the EBITDA formula.

13  94.    Patriot is informed and believes that Sierra intentionally coerced Patriot

14  into signing the March 20 LOI by making false and inaccurate misrepresentations about

15  Sierra's financial status, as well as using the threat of vexatious litigation as a sword to

16  cause Patriot to sign the March 20 LOI without first being permitted to examine Sierra's

17  financial statements.

18  95.    Sierra's coercion and deceit has caused Patriot to incur substantial legal

19  fees during the process of negotiating, while Sierra continuously acted in bad faith with

20  the intention of increasing the purchase price to the detriment of Patriot.

21  96.    As a result of Sierra's deceit and coercion, Patriot has been economically

22  damaged, and has suffered harm to its good will and reputation.

23

24  ## SEVENTH CAUSE OF ACTION

25  ### Federal Unfair Competition And Common Law Violations

26  97.    Patriot realleges and fully incorporates by reference herein paragraphs 1

27  through 96 of this complaint.

28  98.    By virtue of their aforementioned acts, Sierra has engaged in unfair

1  competition in violation of the Federal common law of unfair competition.

2      99.    By the acts complained of herein, Sierra has caused and, unless restrained

3  by this Court, will continue to cause, serious and irreparable injury for which Patriot has

4  no adequate remedy at law.

5      100.    Patriot has no adequate remedy at law.

6

7  **EIGHTH CAUSE OF ACTION**

8  **Unfair Competition- California Business & Professions Code §17200**

9      101.    Patriot realleges and fully incorporates by reference herein paragraphs 1

10  through 100 of this complaint.

11      102.    California Business and Professions Code § 17200 et seq. prohibits unfair

12  competition in the form of any unlawful, unfair, or fraudulent business practice.

13      103.    Sierra's deceit in inducing Patriot to enter into negotiations with MP for

14  the long term railroad license agreement and Sierra's deceit in inducing Patriot to enter

15  into the March 20 LOI, as well as the actions alleged above, are unfair and fraudulent

16  business acts as defined in California Business and Professions Code Section 17200 et.

17  seq.

18      104.    Sierra has committed unlawful acts as defined by California Business and

19  Professions Code § 17200. Sierra has engaged in unlawful business practice including,

20  but not limited to, violation of California Civil Code § 1710 with regard to the

21  representations made regarding the Agreement.

22      105.    Patriot has offered to execute a Stock Purchase Agreement that

23  encompasses all previously negotiated terms, but Sierra now refuses to execute the

24  Agreement based on false claims and unfounded concerns.

25      106.    As a proximate result of the acts above, Patriot was induced to enter into a

26  long term railroad license agreement with MP and committed to investing one million

27  dollars ($1,000,000.00) in railroad infrastructure at the McClellan Business Park and to

28  pay substantial monthly rentals for up to 20 years in reliance on Sierra's representations

1 to negotiate in good faith for the purchase of Sierra by Patriot.

2     WHEREFORE, Patriot prays for judgment against Sierra as set forth below.

3

## **PRAYER FOR RELIEF**

4

5     1.     That an injunction issue against Sierra enjoining them from selling Sierra

6 to any party other than Patriot;

7     2.     That an injunction issue against Sierra mandating that they give Patriot

8 full and unimpeded access to their books of accounts and records relating to the

9 acquisition and sale of Sierra;

10     3.     That the Court order Sierra to specifically perform under the original

11 terms and conditions of the March 20 LOI, and to execute a purchase agreement, as

12 amended by a proper accounting of the value of EBITDA;

13     4.     For damages in an amount according to proof at trial;

14     5.     For punitive damages in an amount appropriate to punish Sierra and deter

15 similar future conduct;

16     6.     For costs of suit incurred including reasonable attorneys' fees;

17     7.     For such other and further relief as the Court may deem just and proper.

18

19

DATED:  December 31, 2008                GREENBERG TRAURIG, LLP

20

21

22     By: _____

23          Grace J. Bergen
             Angela L. Diesch
24          Attorneys for PATRIOT RAIL
             CORP.

25

26

27

28

**EXHIBIT A**



# PATRIOT RAIL CORP.

*Investing in America*

**Gary O. Marino**
*Chairman, President & CEO*

March 20, 2008

Mr. Michael G. Hart
President and CEO
Sierra Railroad Company
221 First Street
Davis, CA 95616

Dear Mike:

Patriot Rail Corp. is pleased to propose a transaction between Patriot Rail or an affiliated entity (collectively the "Purchaser"), and Sierra Railroad Company ("SRC"), whereby Purchaser would purchase all of SRC's assets comprising its freight business and operations, or 100% of the common and other equity interests of SRC and certain of its wholly-owned subsidiaries from its shareholders (the "Sellers") as described below. This offer is based upon the information received to date and is subject to the terms and conditions indicated below.   The proposed transaction described herein is called the "Transaction."

## 1.   Proposed Transaction

(a) Purchaser will acquire, at its option, either all of the assets comprising SRC's freight business and operations, or 100% of the common and other equity interests of SRC and any of its subsidiaries conducting freight business and operations, for a purchase price of seven (7) times Audited Adjusted EBITDA for 2007 (using the methodology described in paragraph 1(e) below which results in an illustrative purchase price of $15,054,410), payable in cash at closing (the "Purchase Price"). SRC's assets shall specifically include current assets (such as cash, customer accounts receivable, inventories and prepaid expenses) and all of the property and equipment used in its freight operations, including but not limited to all land (whether operating or non-operating), mineral rights, buildings, rights-of-way, track, bridges, and other track materials, as well as all locomotives, railcars, and track maintenance equipment and vehicles, whether in use or out-of-service. Such assets also include all easement and leasing revenues currently being recorded on SRC's books, as well as all new business opportunities related to the freight operations, including but not limited to the Oakdale to Riverbank Industrial Park and the Santa Cruz Rail Line opportunities. It is intended that the liabilities to be assumed consist solely of current liabilities of the freight operations (such as accounts payable and accrued expenses), and exclude all interest-bearing and intercompany debt. Current assets and current liabilities shall be computed as of the closing date in accordance with generally accepted accounting principles.

One Boca Place   •   2255 Glades Road / Suite 342-W   •   Boca Raton, Florida 33431
www.PatriotRail.com   •   Telephone: 561.443.5300   •   Facsimile: 561.443.5319

0115

(b) This Transaction specifically excludes all equity interests, assets and liabilities of SRC's and its subsidiaries' tourist rail operations and of Sierra Energy, and also excludes all operations of SRC not related to its freight business and its leasing and easement revenues. For those tourist rail operations that operate over the freight railroad lines, the parties will either assume the existing Operating Agreements or enter into new Operating Agreements for such operations at fair market value rates (currently $300,000 per year based upon the 2007 schedule and use of track, equipment and labor, to be reduced or increased depending on the amount of use by tourist trains), and shall provide that such tourist rail operations shall not unreasonably interfere with the schedule or the safety of Purchaser's freight operations. The parties anticipate that the Purchaser will, by January 1 of each calendar year, be provided with an advance schedule of any anticipated tourist rail operations and that Purchaser shall attempt to reasonably accommodate such schedule as well as any changes to that schedule.

(c) If the Purchaser elects to purchase the assets comprising the freight business and operations of SRC and subsidiaries, the Purchaser shall pay additional income taxes, if any, paid by SRC and/or Sellers resulting from such election.

(d) In partial consideration for the Transaction, and on the understanding that Seller attributes substantial value to the real estate of SRC, Purchaser is amenable to selling, and intends to explore the sale to third parties of, the underlying real property and rights-of-way (including mineral rights) purchased as part of the Transaction. Purchaser and Sellers shall divide on a 50/50 basis the net proceeds – regardless of when paid – from any such sales that are entered into, contracted, completed, or otherwise agreed to as documented in writing, within 15 years following the close of the Transaction. Purchaser shall thereafter retain 100% of the net proceeds of any such sales. All such sales shall provide that the new owners shall not unreasonably interfere with the schedule or safety of Purchaser's freight operations, or be unreasonably detrimental to the economics of Purchaser's freight operations.

(e) In addition to the Purchase Price, Purchaser will pay to Seller 10% of any new freight revenues received, for a period of 10 years following the close of the Transaction, by those customers and under those conditions identified in Exhibit A hereto.

(f) The parties acknowledge that as of the date of this letter, the Purchaser has not been given access to SRC's financial statements for 2007, and that such information has not been audited. Accordingly, the Purchase Price is dependent upon 2007 audited adjusted recurring EBITDA (excluding "one-time" revenues and expenses other than those specifically identified in the paragraph following the table below) ("Audited Adjusted EBITDA") for all freight operations, as outlined in the following table (the following table is based upon unaudited numbers and is illustrative of the methodology to be used in computing Audited Adjusted EBITDA):

|  |  |
|---|---:|
| Estimated EBITDA of all freight operations | $2,320,496 |
| Less "normalized" Maintenance of Way expense at 10% of freight revenues | (286,800) |
| Less "normalized" Maintenance of Equipment expense at 5% of freight revenues | (143,400) |
| Plus estimated actual labor which would have been capitalized for MOW and MOE activities | 325,133 |
| Less Track Maintenance Tax Credit for freight | (276,000) |
| Plus SRC's lease and easement revenues | 211,201 |
| Plus or minus any other one-time items | TBD |
| Adjusted EBITDA | 2,150,630 |
| Times EBITDA multiple | x7 |
| Illustrative Purchase Price | $15,054,410 |

The final Purchase Price will be determined based upon seven (7) times the Audited Adjusted EBITDA for 2007. The parties agree that for the purposes of calculating Audited Adjusted EBITDA, no reductions shall be made for income derived from the sale of locomotives, the loss from the Sierra line, or the loss of McClellan Business Park.

(g) The Purchase Price assumes: (i) a balance sheet at closing with no interest bearing debt; (ii) that none of the related party accounts and notes receivable or payable to or from such related parties will be assumed by the Purchaser; and (iii) that the Purchase Price shall be decreased or increased so that there is at least $1 of net working capital on the balance sheet at closing.

(h) Closing is anticipated to occur on or before 60 days following the full execution of the Asset or Stock Purchase Agreement, during which time the Purchaser will use its best efforts to complete its due diligence and obtain regulatory approval.

**2.    Principal Terms and Conditions**

Consummation of the Transaction will be subject to customary closing conditions, including:

(a) satisfactory completion of a due diligence review by Purchaser and its agents, no later than the closing date, including, without limitation, a legal, financial, commercial and environmental review of SRC's and its subsidiaries' freight operations, and their business prospects, assets, liabilities, customers, and labor relationships;

(b) approval of the proposed Transaction in final form by the Boards of Directors of SRC and Purchaser and their respective subsidiaries, as required;

(c) all necessary other approvals, including, but not limited to, regulatory approvals; and,

(d) an unqualified audit of the 2007 consolidated financial statements, and computation of 2007 Audited Adjusted EBITDA for the freight operations as described in paragraph 1(e), by Bowers & Co., SRC's independent accountants. Purchaser retains the right to have its own independent accountants review the computation of Audited Adjusted EBITDA as computed by Bowers & Co.

**3.    Other Matters**

(a) With respect to the freight operations of SRC and subsidiaries, from the date of this letter until the proposed closing or such earlier date as this letter is terminated, SRC and its subsidiaries will conduct their business only in the normal and ordinary course and in a manner consistent with good business practices. Without the prior written consent of Purchaser, with respect to the freight operations of SRC and its subsidiaries, SRC will not, except for those transactions described on Exhibit B hereto: (i) engage in any transaction which could reasonably be expected to have a material adverse effect on the business, operations, assets, financial condition or prospects of SRC; (ii) amend their Articles or Certificate of Incorporation or bylaws, amend the provisions of any material contracts, pay any cash or non-cash dividends or make any cash or non-cash distributions, redeem or issue any of their equity interests or securities convertible or exercisable into their equity interests; (iii) enter into any transactions with affiliates not in the ordinary course of business; (iv) change any employment arrangements with their officers, directors and other key employees; (v) sell or otherwise dispose of any assets or equipment; or (vi) amend or enter into new collective bargaining agreements. With respect to their freight operations, SRC and its subsidiaries will use their best efforts to preserve their business organizations intact and to preserve their existing business relationships. Notwithstanding the foregoing, SRC may sell assets, and issue or

redeem stock, so long as such event has no effect on the freight assets or business of SRC or the Purchase Price contemplated herein.

(b) As consideration for the substantial expenditures of time, effort, and money, including legal, accounting and other due diligence fees and expenses Purchaser will incur in connection with the aforementioned activities and transactions, SRC and its subsidiaries, by and for themselves and their officers, directors, employees and agents, agree, until the earlier of (a) the execution of the Asset or Stock Purchase Agreement, (b) 150 days from the signing of this letter, or (c) the date negotiations regarding the Transaction terminate, not to, directly or indirectly, negotiate or have substantive discussions with, or enter into any agreement or understanding (whether oral or written) with, any other person or entity for the sale, transfer or disposition of the freight business assets (or related equity securities) of SRC or its subsidiaries. Additionally, from the date this letter is accepted until the earlier of (a) the execution of the Asset or Stock Purchase Agreement, (b) 150 days from the signing of this letter, or (c) the date negotiations regarding the Transaction terminate, SRC and its subsidiaries shall not, and shall cause their officers, directors, employees and their agents not to, with respect to their freight operations, directly or indirectly, (i) take any action to solicit, initiate, encourage or accept any Acquisition Proposal (as hereinafter defined), or (ii) continue, initiate or engage in negotiations with, or disclose any non-public information relating to SRC or its subsidiaries, or afford access to the properties, books or records of SRC or its subsidiaries to any corporation, partnership, person or other entity except Purchaser that may be considering or has made an Acquisition Proposal. The term "Acquisition Proposal" as used herein means any offer, proposal or indication of interest in a merger, consolidation or other business combination or acquisition involving any equity interest in, or a substantial portion of the assets of, the freight operations of SRC or its subsidiaries.

(c) All parties acknowledge that a Confidentiality Agreement between Purchaser and SRC remains in full force and effect and includes all aspects of this proposed Transaction. Any and all disputes, controversies, or claims arising out of, relating to, or in connection with the Confidentiality Agreement or this Letter of Intent shall be instituted and maintained in a competent court in Sacramento County, California and the parties hereby consent to the jurisdiction of any such court and to service of process by any means authorized under California law.

(d) Sellers agree to dismiss, without prejudice, and promptly following the full execution of this Letter of Intent, SRC's lawsuit currently pending in the United States District Court for the Eastern District of California and known as *Sierra Railroad Company v. Patriot Rail, LLC*, Case Number 08 576 LEW-DAD. Purchaser and Patriot Rail, LLC agree that neither they nor any of their related persons or entities will initiate any legal, administrative, or regulatory claim or proceeding either directly or indirectly against SRC or any of its related persons or

entities before notifying SRC in writing of their intentions and giving SRC at least five business days to reinstate its lawsuit against Patriot Rail, LLC. The parties agree that any Asset or Stock Purchase Agreement executed to carry out the Transaction will contain language whereby each of the parties and their related entities will waive any legal claims they may have against the other party and that party's related entities with respect to any and all matters.

(e) Each party will bear its own expenses with respect to the Transaction, including fees and expenses of attorneys, accountants, advisors and consultants.

(f) Except with respect to paragraphs 3(a) through 3(e) above, this letter is not intended to be, and shall not be, a binding contract. Your acceptance of the general principles set forth in this letter shall not constitute an agreement to consummate the Transaction described herein. Such an agreement will be contained only in the Asset or Stock Purchase Agreement, nor shall this letter constitute an agreement to enter into an Asset or Stock Purchase Agreement.

(g) Except as may be required by law, regulations or contractual obligations, neither Purchaser nor Seller or their representatives will make any public or private disclosure or publicity release pertaining to the existence of this letter or the subject matter contained herein without the prior written consent of the other party hereto.

(h) The parties agree to adopt, deliver, execute and make any and all further assurances, instruments, resolutions and documents as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of the parties, and to confirm the rights and benefits provided to each of them herein. Purchaser agrees to work in good faith with Seller to minimize any tax consequences to Seller of the Transaction.

(i) For purposes of this letter of intent, both parties agree that documents delivered by facsimile transmission shall be deemed as original. The parties also agree that this letter of intent may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute but one and the same instrument.

(j) Purchaser acknowledges that it is entering into this agreement on its behalf, and with respect to paragraph 3(d) on behalf of Patriot Rail, LLC, and that the officer executing this Letter of Intent has the authority to enter into this agreement on behalf of, and to bind to the terms of this Letter of Intent, both Purchaser and with respect to paragraph 3(d) Patriot Rail, LLC. Sellers acknowledge that they are entering into this agreement on their behalf and on behalf of SRC and SRC's freight subsidiaries and that the officer executing this Letter of Intent has the authority to enter into this agreement on behalf of, and to bind to the terms of this Letter of Intent, both Sellers, SRC, and SRC's freight subsidiaries.

If the forgoing is acceptable, please sign in the space indicated below and return one original to us. **This proposal will expire at 6:00 p.m. Eastern Daylight Time on Thursday, March 20, 2008, if not accepted prior to that time.**

Sincerely,
**Patriot Rail Corp.**

By:_____
Gary O. Marino
Chairman, President & CEO

_____

**AGREED AND ACCEPTED:**

**Sierra Railroad Company**


By:_____        _____
   Michael G. Hart                Date
   President & CEO

If the forgoing is acceptable, please sign in the space indicated below and return one original to us. **This proposal will expire at 6:00 p.m. Eastern Daylight Time on Thursday, March 20, 2008, if not accepted prior to that time.**

Sincerely,
**Patriot Rail Corp.**


By:_____
    Gary O. Marino
    Chairman, President & CEO

_____

**AGREED AND ACCEPTED:**

**Sierra Railroad Company**

By:_____    March 20, 2008
    Michael G. Hart           Date
    President & CEO

## EXHIBIT A

The new customers listed below are specifically covered by this agreement for earn-outs (including successor companies as applicable). The parties agree that this list is subject to the due diligence of the Purchaser, and Seller will provide satisfactory evidence that (1) Seller has had substantive discussions with these new customers prior to the date of this Letter of Intent, and that either (a) no freight revenues have been received by SRC or its subsidiaries from these new customers during the prior two years, or (b) for the existing customers specifically designated below, the revenue eligible for the earn-out is for new lines of services as described below. The earn-out expressly does not apply to any existing or new customers at McClellan Business Park.

**New Customers by Division or Line**

| Customer | Product(s) |
| --- | --- |
| **OAKDALE-SONORA LINE/RIVERBANK ARSENAL AND RIVERBANK-OAKDALE LINE** | |
| Destel | feed grains |
| Resource Drilling/Vulcan Materials | Rip Rap, sand and Aggregates |
| VS Emultech | Sand & Aggregates |
| TXI | Clay and mineral products |
| Granite Rock | Sand & Aggregates |
| Granite Construction | Sand & Aggregates |
| Teichert | Sand & Aggregates |
| Hansen | Sand & Aggregates |
| Cemex | Sand & Aggregates |
| Quality Trucking/Truck-Rail Handling | Product reloading service company |
| Itec | Plastic Recycling Riverbank |
| American Pallet | Pallets, Bins, Wood products |
| Crystal Geyser | Water products |
| Blue Mountain Minerals | Mineral products |
| AL Gilbert | feed grains |
| Hunt Wesson | Tomato, beans and other food products |
| Valero, Tesoro, Dow, Chevron, and Kiva | tank car storage (new facility and Riverbank Oakdale line) |

## WEST SACRAMENTO-WOODLAND LINE

| | |
|---|---|
| Agrium | tank car storage at new location |
| Valero Storage Facility | Construction of storage track facility and new storage business there |
| Mello Lumber Reload | lumber and construction products |
| Pacific Coast Producers | canned food products |
| Geo Drilling | New product transload |
| Top Grade Construction | Rip Rap, sand and Aggregates |
| Adams Grain | Food and feed grain products |
| Bio Friendly Fuels | Bio Diesel, fuels and fuel additives |
| Interstate Oil | Bio Diesel, fuels and fuel additives |

## PORT OF WEST SACRAMENTO

| | |
|---|---|
| A&A Cement | Cement, fly-ash and aggregate products |
| Cemex | Cement, fly-ash and aggregate products |
| Pan Pacific Cement | Cement, fly-ash and aggregate products |
| Primafuel Tank facility— | Bio Diesel, fuels and fuel additives |
| NorCal Beverages | Alcoholic and non-alcoholic beverages |
| BP Coast | Ethanol, fuels and fuel additives |

## STRATEGIC OPPORTUNITIES

Riverbank-Oakdale line purchase from BNSF (all freight)
UP West Sacramento Operations (all freight)
BNSF service on UP tracks in West Sacramento (all freight)
UP Santa Cruz Operations (all freight)
TRI Railway/Reno Engineering (Reno Industrial Switching Complex facilities near Sparks, NV—all freight)

## EXHIBIT B

1. Real property in or near Clarksburg , California (2 parcels)
2. Powertrain (LREP) Project stays with Sierra Energy Corporation
3. Sierra Energy Corporation
4. Mendocino Railway (The Skunk Train) and all of its historical records
5. V&T opportunity and Disney Train stays with Sierra Entertainment
6. Sierra Entertainment and its historical records predating SRC
7. Dinner Train Station in Oakdale (presently in name of SRC) (a)
8. River Train Station in Woodland (presently in name of SRC) (a)
9. River Train station at Elkhorn (presently in name of SRC)(a)
10. Pre-existing and unused tax credits valued at roughly $1M.(b)
11. $1.2 million intercompany note from Sierra Energy to Sierra Railroad Company
12. Balance of Sierra Energy intercompany $250k Line of Credit to SRC
13. Office building at 221 1st Street (already transferred on books, but title must change)
14. Notes on the City of West Sacramento agreement (which have been assigned)
15. The potential billboard land sale on the Woodland branch, and the land sale for the Lowes on the Oakdale branch. ©

(a) Track is to be retained by the freight operations and is not included in this transfer.
(b) To the extent the tax credits cannot be sold or transferred, they shall remain with SRC.
(c) If such sales are not consummated by the closing date of the Transaction, these properties will be retained by SRC.

ONE BOCA PLACE  •  2255 GLADES ROAD / SUITE 342-W  •  BOCA RATON, FLORIDA 33431
WWW.PATRIOTRAIL.COM  •  TELEPHONE: 561.443.5300  •  FACSIMILE: 561.443.5319

0124