1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   PATRIOT RAIL CORP.,                        No.  2:09-cv-0009-TLN-AC

12                    Plaintiff,

13        v.                                     **ORDER DENYING PATRIOT'S MOTION
                                                 FOR NEW TRIAL (ECF NO. 452)**
14   SIERRA RAILROAD CO.,

15                    Defendant.

16
     AND RELATED COUNTERCLAIMS
17

18        This matter is before the Court pursuant to Plaintiff Patriot Rail Corporation's ("Patriot")

19   motion for a new trial (ECF No. 452-1).  Defendant Sierra Railroad Company ("Sierra") has filed

20   an opposition to Patriot's motion (ECF No. 558), and Patriot has filed a reply (ECF No. 565).

21   The Court has carefully considered the arguments raised by the parties' briefing.  For the reasons

22   set forth below, Patriot's motion for a new trial is hereby DENIED.[1]

23   ///

24

25   _____

     [1]      Patriot filed evidentiary objections and a motion to strike declarations of Michael Weed (ECF No. 558-1),
     J.R. Riddell (ECF No. 558-2) and Forrest Vickery (ECF No. 558-3).  (ECF No. 566.)  Within its motion, Patriot filed
26   55 motions based on hearsay, irrelevance and the best evidence rule.  The Court finds that most of these arguments
     are tedious and meritless at best.  However, in an effort to curtail objections and finally come to a conclusion on the
27   contentious and never ending nature of this litigation, the Court has limited its review to the trial transcript and those
     exhibits that were entered into evidence at trial, in deciding this matter,.  As such, the Court hereby **DENIES AS
     MOOT** Patriot's Evidentiary Objections and a motion to strike declarations of Michael Weed, J.R. Riddell and
28   Forrest Vickery (ECF No. 566).

                                                    1

## I.  FACTUAL BACKGROUND

On March 28, 2014, a jury awarded Sierra compensatory damages in the amount of $22,282,000 for breaching a non-disclosure agreement (the "NDA") between the parties.  (Jury Verdict, ECF No. 447.)   The jury also found that Patriot misappropriated Sierra's trade secrets and that "one or more officers, directors, or managing agents of Patriot acted willfully and maliciously in misappropriating Sierra's trade secrets." (ECF No. 447.)  After the liability phase of the trial, the issue of exemplary damages was tried before the jury, whereupon the jury awarded Sierra exemplary damages for Sierra's intentional interference claim in the amount of $16,200,000 against Patriot Rail Corp./Company LLC and $1,200,000 against Patriot Rail LLC/ Pacific Rail LLC.  (ECF No. 482.)  In a separate order, the Court awarded Sierra $13,144,465 in exemplary damages on Sierra's misappropriation of trade secrets claim against Patriot Rail Corp./Company LLC, separate and apart from the jury's punitive damages verdict on the interference claim.

Patriot has moved for a new trial pursuant to Federal Rule of Civil Procedure 59.  (ECF No. 452-1.)  Patriot argues that it is entitled to a new trial based on four alleged evidentiary errors, the first relating to a deferred motion in limine that Patriot filed, and the last three relating to various rulings this Court made during the trial.

## II.  LEGAL STANDARD

Rule 59(a)(1)(A) provides that a court may grant a new trial on all or some of the issues and to any party "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  "Rather, the court is 'bound by those grounds that have been historically recognized.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *id.*). Recognized grounds include, but are not limited to, allegations "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to

1    the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a

2    miscarriage of justice."  *Molski*, 481 F.3d at 729; *see also Passantino v. Johnson & Johnson*

3    *Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000) (stating the same).  "Upon the Rule 59

4    motion of the party against whom a verdict has been returned, the district court has 'the duty to

5    weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though

6    supported by substantial evidence, where, in the court's conscientious opinion, the verdict is

7    contrary to the clear weight of the evidence.'"  *Molski*, 481 F.3d at 729 (quoting *Murphy v. City*

8    *of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

9       **III.   ANALYSIS**

10       Patriot argues that numerous errors occurred during the trial that require this Court to

11    order a new trial.  The Court addresses each of Patriot's arguments in turn.

12       A.    Alleged Errors Regarding the Testimony of Stan Wlotko

13       Patriot argues that Sierra's counsel violated this Court's motion in limine ruling by

14    referencing Stan Wlotko's ("Wlotko") arrest record during his testimony and also contends that

15    the Court erred in striking Wlotko's testimony after he had testified.

16       *i.    Wlotko's Arrest History*

17       Patriot contends that it moved in limine to preclude Sierra from "arguing, referring to,

18    introducing any documents, or questioning any witnesses at trial concerning … criminal

19    behavior."  (ECF No. 321, at 2:4–7.)  The Court has reviewed the motion in limine and finds that

20    Patriot's characterization of its motion is not indicative of what the motion actually referenced.

21    The full text of the motion is as follows:

22          Plaintiff/Counter Defendant Patriot Rail Corp. and Cross
           Defendants Patriot Rail, LLC and Larry Coe (collectively, Patriot)
23          respectfully move this Court for an order prohibiting Defendant and
           Counter-Claimant Sierra Railroad Company ("Sierra") and its
24          counsel from arguing, referring to, introducing any documents, or
           questioning any witnesses at trial concerning: (1) any allegedly
25          improper relationships between persons related to this litigation;
           and (2) other disparaging remarks alleging criminal behavior.
26
          This Motion is made pursuant to Federal Rules of Evidence 602,
27          802, and 701 on the grounds that the testimony is not based on
           personal knowledge, is inadmissible hearsay, and is improper
28          character and opinion testimony.   This Motion is further made

3

pursuant to Federal Rules of Evidence 401, 402, and 403 on the grounds that such testimony is irrelevant, will waste time, will confuse the issues, and is prejudicial. Remarks concerning the personal character and relationships of various persons have no probative value in supporting or defending Sierra's claims.

This Motion is based on the accompanying Memorandum of Points and Authorities, the supporting Declaration of Mary-Olga Lovett, the records on file in this action, and any further matters presented at the hearing on this Motion.

(ECF No. 321.)  Due to the over-breadth of the motion, Sierra filed an opposition asking for clarification.  (ECF No. 346.)  In response, Patriot replied that it "seeks to exclude all disparaging remarks alleging criminal behavior, and Patriot, in its Motion, provides specific examples of such remarks by Mike Hart."  (ECF No. 368.)

At the pre-trial conference, Patriot again stated that the purpose in bringing the motion was to exclude statements made by Michael Hart ("Hart"):

The first part of our motion seeks to exclude allegations of criminal behavior.  For example, we have statements by Mr. Hart, Michael Hart, that Patriot stole business, that Patriot was like dealing with the mob, and we think that any allegations of criminal behavior in this case should be categorically excluded under Rules 401, 402 and 403 as well as any evidence of criminal activity that doesn't meet the requirements of Rule 609.

Sierra makes two objections to our request.  One, it does not know the scope and it's unclear as to what we're seeking to exclude.  In response to that, we have provided specific examples.  And, secondly, I can think of no allegation of criminal behavior in this case that would be proper.  Our motion is very succinct.  We're asking the court to prohibit any allegations of criminal wrongdoing by Patriot.

Sierra also says we have a trade secret claim, and under the statute it does mention theft, that's true, but theft is only one of a variety of ways one could violate the trade secret statute.

I will note their counterclaim is for misappropriation of trade secrets, not theft of trade secrets.  It's undisputed that Sierra gave the alleged trade secrets to Patriot.  Patriot did not steal them. So we think that any mention of theft, whether it's criminal theft or theft within the context of a trade secrets claim, we think that should be excluded.

With respect to allegations of improper relationships, there's a variety of instances outlined in our brief where there were allegations of allegedly improper relationships. We think that those -- the mention of those relationships should be excluded because we

4

1    think the evidence at trial will be there will be no underlying
     predicate laid to allow those.

2

3    (Mots. in Limine Hr'g Tr., ECF No. 383, at 20:20–22:03.)

4    Patriot never mentioned previous arrests by Wlotko as being an issue.  Instead, all of the

5    briefing and arguments were directed at comments Hart had made about Patriot's actions

6    concerning the non-disclosure agreement and McClellan Business Park ("MBP").  Patriot's recent

7    assertions that this motion pertained to Wlotko's arrest history is disingenuous at best.  Moreover,

8    the Court did not grant the motion, rather, the Court deferred it—cautioning the parties to avoid

9    the "irrelevant personal private lives of witnesses."  (ECF No. 383, at 25:2–5.)

10   Furthermore, the Court finds that Sierra's questioning was wholly proper under Rule

11   608(b) because Wlotko's prior perjured testimony was highly relevant to his credibility.  In fact,

12   Patriot put this specific instance of untruthfulness at issue.  Just minutes into Patriot's opening

13   statement, counsel asserted that she and Wlotko were "going to own something up front,"

14   acknowledging that, during a 2006 expert witness deposition, Wlotko lied about two subjects:

15   whether he graduated from college and whether he had been fired from a job.  (Trial Tr., Vol. I, at

16   7:21–8:17.)  Counsel then suggested this untruthful testimony should not undermine Wlotko's

17   credibility because he told his lawyers that he had lied "as soon as he realized" that his answers

18   "weren't completely truthful."   (Trial Tr. Vol. I, at 8:9–12.)

19   When Wlotko took the stand, Patriot's counsel questioned him at length about how "in a

20   deposition under oath [he] misstated two things—that he didn't graduate from college and that he

21   was terminated from RailAmerica."   (Trial Tr. Vol. III, at 410:14–415:19.)  When asked why he

22   lied under oath, he explained that "it was a stupid thing to do" but also "a lesson learned."  (Trial

23   Tr., Vol. III, at 415:4–8.)  He failed to mention that there was a third thing that he had lied about

24   during his deposition, his arrest history.  On cross-examination, Sierra pursued a brief line of

25   questioning to show that Wlotko had lied about three subjects during his deposition testimony,

26   not two, and in doing so, Wlotko lied in front of the jury.  (Trial Tr. Vol. III, at 454:20–456:2.)

27   Sierra's counsel possessed a minute order from the District Court in the District of Columbia that

28   set out in particular detail what issues Mr. Wlotko had lied about under oath during the

5

1   deposition, which included his arrest history.  (Trial Tr. Vol. III, at 451:2–5.)  Sierra's counsel did

2   not attempt to enter the minute order into evidence.  Upon Patriot's objection, the Court held that:

3   (1) this matter was not covered by Patriot's previous motion in limine (Trial Tr. Vol. III, at

4   451:20–22, 453:13–14); (2) Sierra's counsel's use of the minute order was used to refresh the

5   witness's recollection (Trial Tr. Vol. III, at 453:21–24); and (3) the line of questioning was proper

6   under Federal Rule of Evidence 608(b) (Trial Tr., Vol. III, at 453:21–454:09).  In short, Sierra did

7   not impeach Wlotko with his arrest history, but instead properly impeached him by showing that

8   he lied about three things in 2006, and then concealed one of those lies from this jury, while

9   claiming that he had come fully clean about his prior perjured testimony.  (Trial Tr. Vol. III, at

10  454:20–455:25.)

11                    *ii.*      The Court's Order Striking Wlotko's Testimony

12          Patriot next contends that the Court erred by striking a portion of Wlotko's trial testimony.

13  (ECF No. 452-1, at 8–11.)  The Court finds no error, and further finds that even if this Court had

14  erred, a new trial is not warranted because the ruling did not substantially affect Patriot's rights.

15  *See* Fed. R. Civ. P. 61.

16                    a.      Background Information

17          Over Sierra's objection, the Court permitted Wlotko to testify that he received Sierra's

18  revenue information from MBP outside of the bid process.  (Trial Tr. Vol. X, at 1574:11–1583:4

19  (noting the testimony remained subject to a motion to strike); Trial Tr. Vol. X, at 1646:17–1647:6

20  (testifying he learned the information "way before any RFP").)  This testimony directly

21  contradicted Paragraph 22 of Patriot's First Amended Complaint ("FAC"), stating "On or about

22  November 15, 2007, Patriot submitted a proposal responding to the RFP for MP.  Patriot's

23  proposal was based on information provided by MP, which was the same information provided

24  and/or made available to the other bidders" (ECF No. 61 at ¶22), and Paragraph 24 of the original

25  Complaint, stating: "The basis for Patriot's proposal to MP was the information provided to

26  Patriot by MP, which was the same information provided to the other bidders" (ECF No. 2 ¶ 24).

27          Following Wlotko's testimony, the Court sought additional evidence from Sierra

28  regarding prejudice and initially ruled that it would allow Patriot to amend the FAC.  (Trial Tr.

                                                          6

1   Vol. X, at 1619:6–1631:4.)  Sierra then moved to strike the testimony that contradicted Paragraph

2   22 in the FAC, also citing other evidentiary admissions that the testimony contradicted, including

3   Wlotko's own deposition testimony and a written statement by Patriot's CEO.  (Trial Tr. Vol. XI,

4   at 1700:13–1719:21 (citing Trial Tr., Vol. X, at 1628:8–13 (quoting Wlotko Dep. admitting he

5   received information "during the bid process."); Ex. N-4 (Marino email stating "[t]he basis for

6   our proposal was the information provided to us by MBP which was the same information that

7   was provided to the other bidders.")).)

8         Based on Sierra's arguments, the Court reconsidered, struck the testimony, and clarified

9   the scope of its ruling.  (Trial Tr. Vol. XI, at 1710:18–1719:21; 1748:13–1750:2; 1877:18–

10  1881:16.)  Patriot moved for reconsideration (ECF Nos. 430), and Sierra opposed (ECF No. 433).

11  On March 25, 2014, the Court denied Patriot's motion.  (Trial Tr. Vol. XII, at 2070:14–2074:8.)

12  On March 26, via a stipulated instruction, the Court informed the jury that Wlotko's testimony

13  had been stricken:

14           During the course of this trial, you heard testimony from Stanley
             Wlotko that he received revenue information provided by
15           McClellan outside of the bidding process and independent of the
             information that McClellan provided to all of the bidders, and that
16           he performed certain calculations based on this information.  This
             testimony has been stricken from the record, and so you are
17           therefore not permitted to consider it.

18  (Trial Tr. Vol. XIII, at 2115:03–10.)

19                         b.    Analysis

20         "Judicial admissions are formal admissions in the pleadings which have the effect of

21  withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."  *Am.*

22  *Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).  Patriot's judicial admissions

23  conclusively established that it relied upon only the information it received from MBP during the

24  bid process. (ECF No. 61 at ¶ 22; ECF No. 2 at ¶ 24.)  Patriot's binding admissions in the

25  Complaint and FAC were bolstered by numerous evidentiary admissions.  (*See* Trial Ex. N-4;

26  Trial Tr. Vol. X, at 1628:8–13.)  Wlotko's testimony directly contradicted all of these admissions.

27  (Trial Tr. Vol. X, at 1603:13–1607:17, 1646:17–1647:6.)  Thus, the Court properly held Patriot

28  accountable to its binding judicial admission and struck Wlotko's contradictory testimony.  *See*

1   *Unigard Sec. Ins. Co. v. Lakewood Eng'r & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (the

2   Court has "broad discretion" to control the conduct of a trial); *United States v. Panza*, 612 F.2d

3   432, 438 (9th Cir. 1979) (such discretion includes the power to strike testimony).

4       Patriot argues that the Court's Final Pretrial Order "which controls the course of the action

5   unless the court modifies it (Fed. R. Civ. P. 16(d)) – expressly identifies, as disputed factual

6   issues for trial, the precise issues that Sierra belatedly succeeded in having the Court strike from

7   Mr. Wlotko's testimony."  (ECF No. 452-1, at 8 (internal quotations omitted).)  Patriot presents

8   no authority supporting its argument that vaguely stated disputed factual issues identified by the

9   opposing party in the Final Pretrial Order supersede specific factual allegations in the live

10  complaint.  *See Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir.1996) ("When a pleading is

11  amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission....").

12      Patriot next argues that it should be permitted to amend its complaint to allege the factual

13  issues set forth in the Final Pretrial Order.  (ECF No. 452-1 at 10.)  Federal Rule of Civil

14  Procedure 15(b) allows for an amendment to conform to the evidence at trial, and the "court

15  should freely permit an amendment when doing so will aid in presenting the merits."  Fed. R. Civ.

16  P. 15(b)(1).  The testimony at issue was not beyond the scope of the pleadings as contemplated by

17  Rule 15(b), but impermissibly contradicted a binding admission Patriot made in the pleadings.

18  The law allows a party to amend in order to explain an ambiguity in the pleadings.  *See Sicor Ltd.*

19  *v. Cetus Corp.*, 51 F.3d 848, 859–60 (9th Cir. 1995).  However, it does not allow a party to

20  contradict binding admissions to avoid an unwanted outcome.  *See Am. Title Ins.*, 861 F.2d at 226

21  ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial

22  admissions conclusively binding on the party who made them."); *Curry v. CTB McGraw-Hill,*

23  *LLC*, 296 F. App'x 563, 564 (9th Cir. 2008) (applying *Am. Title Ins.* in finding that admissions

24  made in the plaintiff's complaint were binding).

25      Moreover, the Court correctly found that Patriot's proposed amendment would prejudice

26  Sierra.  The four factors used to determine the propriety of a motion for leave to amend are: "bad

27  faith, undue delay, prejudice to the opposing party, and futility of amendment."  *DCD Programs,*

28  *Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987).  "[D]iscretion to deny leave to amend is

1    particularly broad where plaintiff has previously amended the complaint." *Cafasso v. Gen.*

2    *Dynamics C4 Sys.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citations omitted).   Sierra grounded its

3    trial strategy on proving MBP did not provide to the other bidders the trade secrets used by

4    Patriot, leaving only one place Patriot got them—from Sierra's materials that were covered by the

5    NDA.  Proving this was a cornerstone of Sierra's case.  Thus, the Court found that changing trial

6    strategies mid-way through the trial would greatly prejudice Sierra.  *See Little v. Liquid Air Corp.*,

7    952 F.2d 841, 846 (5th Cir. 1992) (upholding denial of a late pre-trial Rule 15(a) request that

8    "would have established an entirely new factual basis for the plaintiffs' claims" requiring the

9    parties to alter their trail strategies and re-open discovery).

10          Finally, even if the Court erred in denying Patriot's motion to amend and striking

11   Wlotko's testimony, such errors would be harmless.  Exclusion of testimonial evidence is not

12   prejudicial where the evidence would not change the outcome of the case.  *See Hallmark Industry*

13   *v. Reynolds Metals Co.*, 489 F.2d 8, 14 (9th Cir. 1973); *see also Trans. Miss. Corp. v. United*

14   *States*, 494 F.2d 770 (5th Cir. 1974) ("error was harmless in face of crushing weight of evidence

15   against company's position").  Wlotko demonstrated a lack of candor in front of the jury.  (*See*

16   Trial Tr. Vol. X, at 1651:7–1652:7 (Wlotko acknowledging he did not tell Sierra about his

17   purported calculations until trial); 1571:9–1572:14 (lying about his educational history in

18   Patriot's bid).)  Even Patriot's opening statement, which actually contradicted Wlotko's

19   testimony, underscored the problems with his story.  (*Compare* Trial Tr. Vol. I, at 32:16–21

20   (stating, "We knew the MBP revenue.  MBP told us…All we did was do the math and say we

21   think we can get 3.2 million in gross revenue, and that's 356 percent more."), *with* Trial Tr. Vol.

22   X, at 1617:7–25 (Wlotko testifying he estimated revenue of $900,000 to do the math, stating,

23   "This is close to your number or maybe it's not close, but this is what I'm estimating is your

24   revenue."); *and* Trial Tr. Vol. X, at 1654:2–14 (confirming Patriot's bid does not identify this

25   calculation as an estimate).  Given Wlotko's complete lack of credibility, the reasonable

26   conclusion is that the jury would have given no credit to his new story even if it had not been

27   stricken.  *See Camps v. New York City Transit Auth.*, 261 F.2d 320, 323 (2d Cir. 1958) (finding

28   that improper evidentiary ruling was harmless where the witness's credibility was otherwise

1    impeached).

2         B.    The Court's Spoliation Instruction

3         Patriot asserts that the Court erred when it issued Jury Instruction No. 63— permitting the

4    jury to draw an adverse inference from Patriot's failure to produce updated financial information

5    related to MBP.  (ECF No. 452-1, at 11–18.)  The Court finds that, again, there was no error, and

6    a new trial is unwarranted because the supposed error did not substantially affect Patriot's rights.

7    Fed. R. Civ. P. 61.

8              i.    *Factual Background*

9         This litigation has been contentious throughout the entire process.  Before this matter

10   came before the undersigned, the parties had numerous discovery disputes.  (*I.e.*, ECF No. 23, 38,

11   55, 70, 192, 201.)  On February 9, 2012, Sierra filed a motion to compel supplemental discovery.

12   (ECF No. 201.)  The Court denied Sierra's motion after Patriot's counsel represented to the Court

13   that it did provide the requested supplemental responses on February 15, 2012, following Sierra's

14   motion, and produced additional documents on February 23, 2012.  (Order, ECF No. 244.)

15   However, the Court admonished Patriot that Federal Rule of Civil Procedure 26(e)(1)(A) requires

16   that it supplement disclosure and discovery if some material aspect of its previous disclosure is

17   incomplete or incorrect.  (ECF No. 244 at 2.)  On December 20, 2012, Sierra brought another

18   motion to compel supplemental discovery.  (ECF No. 247.)  On February, 28, 2013, Patriot filed a

19   motion to compel further responses to discovery, (ECF No. 257), which it withdrew on March 14,

20   2013 (ECF No. 259).

21        This matter concerns the contents of Sierra's December 2012 motion.  Sierra sought to

22   compel the production of an unredacted stock purchase agreement ("SPA") between Patriot

23   Funding LLC and Patriot Rail Holdings LLC, facilitating the sale of Patriot Rail Corp. to

24   SteelRiver in May 2012.  (ECF No. 247.)  Sierra also sought to compel "related documents"

25   apparently identified in the Declaration of Forrest Vickery, including California Form 100

26   Income Tax Returns from 2008 to 2013, California Property Returns from 2008 to 2011, the 2012

27   Operating Budget for Sacramento Valley Railroad ("SAV") Operations at McClellan Park, and

28   data pertaining to SAV used to create the total Patriot operating budget.  (ECF No. 247.)  The

1    Court denied the motion without prejudice because it was procedurally deficient.  (ECF No. 304.)

2    Sierra neglected to file a subsequent motion to compel and instead filed a motion in limine to

3    prohibit Patriot from introducing documents that Patriot had failed to timely produce in

4    discovery.  (ECF No. 336.)

5         In its briefing, Sierra asserted that "[d]espite repeated requests from Sierra, Patriot has

6    withheld documents upon which Sierra and its expert, Forrest Vickery, could have calculated

7    Sierra's damages.  Given Patriot's failure to produce these documents, Patriot should not be

8    permitted to rely on them now."  (ECF No. 336 at 2.)  Specifically, Sierra referred to:

9
                (1) any documents relating to the sale of Patriot to SteelRiver that
10              Patriot failed to produce by January 2, 2014 (the deadline for filing
                supplemental expert reports), including the redacted portions of the
11              Stock Purchase Agreement and related documents; and (2) any
                other documents that Patriot has not previously produced that it
12              would otherwise seek to use in an effort to challenge Sierra's
                damages calculations, including the updated financial and
13              operational information requested by Sierra on November 8, 2014.

14   (ECF No. 336 at 2.)  In response, Patriot filed a Non-opposition that stated as follows:

15              Plaintiff/Counter Defendant Patriot Rail Corp. and Cross
                Defendants Patriot Rail, LLC and Larry Coe (collectively,
16              "Patriot") does not oppose Sierra Railroad Company's ("Sierra's")
                Motion In Limine No. 4.
17
                As Sierra knew for a week before filing its motion in limine, Patriot
18              has not included on its exhibit list any of the documents Sierra is
                asking the Court to exclude.  Patriot did not include those
19              documents on its list because it has no intention of using them as
                evidence at trial.
20
                Therefore Patriot does not oppose Sierra's motion in limine and
21              agrees not to rely on any of the documents related to the sale of
                Patriot to SteelRiver or the updated financial and operational
22              documents referred to in Sierra's motion.

23   (ECF No. 342 at 2.)  Thus, Patriot confirmed the existence of supplemental discovery that was not

24   disclosed to Sierra.

25        The Court granted Sierra's motion in limine.  (Pretrial Conference Tr., at 35:17.)  After

26   the Court's ruling, Sierra's counsel requested clarification as to the Court's ruling.  (Pretrial

27   Conference Tr., at 37:12–38:7.)  Specifically, counsel stated that it was his understanding that the

28   Court's ruling precluded using the following for any reason including impeachment or rebuttal:

> any documents related to the sale of Patriot to Steelriver and any other documents that Patriot failed to produce by January 2, 2014, that would otherwise seek to use in an effort to challenge Sierra's damages calculations, including the updated financial and the operations information requested by Sierra on November 8, 2013.

(Pretrial Conference Tr., at 37:25–38:7.)   In response, Patriot's counsel responded:

> Your Honor, we are quite clear and I will inform the court that the discussions that we've had over the last 24 hours, went to my experience, over 20 years of having damages and updated financials produced to the other side, sometimes up to the end of trial because these damages are continuing to accrue. I will certainly accept Sierra's position and we understand any purpose to mean exactly that.

(Pretrial Conference Tr., at 38:9–38:16.)   To which, the Court admonished the parties: "Let me just say this.  Either party runs afoul of the Court's motions in limine, you risk—you do so at your peril.  I just want to warn you now."  (Pretrial Conference Tr., at 38:18–38:21.)

Despite having notice of this instruction, Patriot challenged Sierra's range of damages in its opening statement.  (Trial Tr. Vol. I, at 34:9–12.)  Sierra argued that Patriot's failure to supplement its financial information made the range necessary and sought permission to address Patriot's nonproduction with Mr. Vickery's testimony.  (Trial Tr. Vol. XI, at 1768:8–1773:3.) The Court denied the request, but cautioned Patriot's counsel that if she raised the issue the request would be revisited:

> But to the extent that Patriot is arguing that the damages are speculative, then I would allow Sierra to rehabilitate the witness. So I might very well revisit the issue at that point.  Because I can very well foresee that Patriot may very well question a witness regarding the speculative nature of these documents, and then I might be inclined to allow Sierra to rehabilitate the witness.  So approach at that point.  Other than that, we're not going [to] rehash discovery issues before the jury, and I've already made my stance on this issue clear.

(Trial Tr. Vol. XI, at 1772:21–1773:6.)

On cross-examination, Patriot attacked Vickery's range of damages.  (Trial Tr. Vol. XII, at 1928:2–1929:9.)  Subsequently, at side bar, Sierra's attorney argued that the range of numbers was due to Patriot's failure to supplement the financial discovery.  (Trial Tr. Vol. XII, at 1933:24–1934:6.)  The Court agreed that Patriot had opened the door and allowed Sierra to

12

rehabilitate Vickery:

> You asked about the range. . .  When I heard the question and when I saw the numbers, quite frankly, I knew you were going to ask to approach immediately.  Because we specifically discussed this, and we said, listen, it would be unfair to present that range without Sierra's responding that they didn't get those financials. I knew this was going to occur.  I'm going to allow you to ask the question.

(Trial Tr. Vol. XII, at 1934:15–1935:1.)  On redirect examination, Vickery testified that Patriot had agreed, but failed, to produce financial information, thereby necessitating the range of damages.  (Trial Tr. Vol. XII, at 1933:24–1936:12; 1938:13–1940:10.)

On March 25, the parties argued disputed jury instructions.  (Trial Tr. Vol. XII, at 2021:8–2026:17.)  Patriot objected to Given Jury Instruction 63[2] because it argued that there were no facts or evidence before the jury which showed that Patriot failed to produce evidence.  (Trial Tr. Vol. XII, at 2021:19–25.)  In response, Sierra reiterated that Vickery testified without rebuttal that the information was requested and promised, but never produced.  (Trial Tr. Vol. XII, at 2021:19–25.)  Patriot's counsel countered that the request was "tantamount to a discovery sanction."  (Trial Tr. Vol. XII, at 2025:13–14.)  The Court ruled as follows:

> We've talked about this issue on a number of occasions. And, quite frankly, you know, Patriot was put in the position or took the position that they would simply ask Mr. Vickery about the range. In explaining that range, he explained that he needed certain numbers in order to come up with, and the suggestion was, more accurate, more accurate numbers.  And those are documents which he wasn't provided during the course of this trial, and I told counsel to be careful in this particular area.
>
> And, you know, this instruction does adequately state the state of the evidence, and it still hasn't been, you know, explained to my satisfaction.  It appears, based on everything Sierra has put forth, that they were requesting certain documentation, which Patriot repeatedly said it would provide to Sierra, yet it wasn't provided to Sierra.  And, in fact, it -- on the one hand, you can say, well, Sierra should have filed a motion to compel certain documents.   But certainly I don't find Sierra's reliance upon Patriot's representations to be misplaced, that they were going to provide the information, which essentially they never provided.   Okay.   So the Court is going to give Sierra's proposed instruction No. 39.

---

[2]   Given Jury instruction 63 was at the time referred to as Sierra Railroad Company's Proposed Jury Instruction No. 39.  (*See* ECF No. 431.)

1  (Trial Tr. Vol. XII, at 2025:21–2026:17.)

2          The Court instructed the jury as follows:

3                You have heard testimony about evidence which has not been
              produced.  Counsel for Sierra has argued that this evidence was in
4              Patriot's control and would have proven facts material to the matter
              in controversy.  If you find that Patriot could have produced the
5              evidence, and that the evidence was within its control, and that this
              evidence would have been material in deciding among the facts in
6              dispute in this case, then you are permitted, but not required, to
              infer that the evidence would have been unfavorable to Patriot.
7
              In deciding whether to draw this inference, you should consider
8              whether the evidence not produced would merely have duplicated
              other evidence already before you.  You may also consider whether
9              Patriot had a reason for not producing this evidence, which was
              explained to your satisfaction.  Again, any inference you decide to
10             draw should be based on all of the facts and circumstances in this
              case.
11

12  (Jury Instruction 63, ECF No 442 at 67; Trial Tr. Vol. XI, at 2142:25–2143:16.)

13                *ii.     Analysis*

14         The Ninth Circuit recognizes a district court's inherent power "to permit a jury to draw an

15  adverse inference from the destruction or spoliation" of evidence.  *Glover v. BIC Corp.*, 6 F.3d

16  1318, 1329 (9th Cir. 1993).  Spoliation includes nonproduction of relevant evidence.  *See* Fed R.

17  Civ. P. 37 Advisory Committee Notes (1993) (treating nonproduction like spoliation); *see also*

18  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).  "When the contents of a

19  document are relevant to an issue in a case, the trier of fact generally may receive the fact of the

20  document's nonproduction or destruction as evidence that the party that has prevented production

21  did so out of the well-founded fear that the contents would harm him."  *Id.*  "For the rule to apply,

22  it is essential that the evidence in question be within the party's control.  *Id.* (citing *Gumbs v. Int'l*

23  *Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983)).  Furthermore, it must appear that an actual

24  suppression or withholding of the evidence has occurred.  *Id.*  "No unfavorable inference arises

25  when the circumstances indicate that the document or article in question has been lost or

26  accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."

27  *Id.*

28         Sierra's lost business value damages ranged from $11 to $25 million.  (Trial Tr. Vol. XI,

1   at 1844:9–18.)  Patriot challenged the purportedly speculative nature of this range both in its

2   opening arguments and during its cross-examination of Vickery.  (Trial Tr. Vol. I, at 34:9–12;

3   Trial Tr. Vol. XII, at 1928:2–1929:9.)  Vickery's rehabilitated testimony explained that the range

4   was due to incomplete financial data that Patriot agreed to produce but did not.  (Trial Tr. Vol.

5   XII, at 1939:2–1940:10.)  A reasonable jury could infer that Patriot's actual 2013 profits (the

6   withheld information) exceeded the historical average and 2013 budget prediction (the

7   information Vickery had), and would cause Sierra's damages to go up if produced.  Therefore, the

8   $18 million awarded by the jury may well represent a reasoned decision that the withheld

9   information was harmful to Patriot, but without giving Sierra full credit for Patriot's budgeted

10   profits.

11         Furthermore, as to Patriot's assertion that the instruction was a sanction, the record does

12   not support Patriot's interpretation.  As Sierra has recognized in its briefing, there are two types

13   of "adverse inference" instructions—mandatory and permissive.  (ECF No. 558, at 16 (citing

14   *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392 (2d Cir. 2013)).  Unlike mandatory adverse inference

15   instructions, permissive instructions allow, but do not require, a jury to infer a specified

16   conclusion from other facts.  *United States v. Warren*, 25 F.3d 890, 897 (9th Cir. 1994).  The

17   instruction given by the Court was a permissive instruction.  It left the jury in full control of all

18   fact-finding and only explained to the jury that it was free, but not required, to infer one fact from

19   another it determined to be true.  Specifically it stated that "*if*" the jury found "that Patriot could

20   have produced the evidence, and that the evidence was within its control, and that this evidence

21   would have been material in deciding among the facts in dispute in this case," then the jury was

22   "*permitted, but not required*, to infer that the evidence would have been unfavorable to Patriot."

23         A permissive instruction is not a sanction, but an explanation of the jury's fact-finding

24   powers.  *Mali*, 720 F.3d at 393–394.  The instruction given here is analogous to that given in

25   *Mali*.  There, the Second Circuit held that the district court had not erred in giving a permissive

26   adverse inference instruction without making a finding:

27              The court did not direct the jury to accept any fact as true. Nor did
              it instruct the jury to draw any inference against the Plaintiffs. The

28              court left the jury in full control of all fact finding. It did no more

1

than explain to the jury that in the event it found one fact to be true,
it was free, but not required, to infer another fact from the first.
While such an instruction is indeed an "adverse inference
instruction," in that it explains to the jury that it is at liberty to draw
an adverse inference, it is not the sort of punitive adverse inference
instruction.

2

3

4

5    *Id.* at 393.  Thus, because the record supports a rational connection between the inference and the

6    meaning of the evidence, the instruction was proper.  *See Med. Lab. Mgmt. Consultants v. Am.*

7    *Broad. Companies, Inc.*, 306 F.3d 806, 824 (9th Cir. 2002).

8         C.    Vickery's Expert Witness Testimony

9         Patriot asserts that Sierra's expert witness Forrest A. Vickery ("Vickery") offered

10   incompetent testimony.  Specifically, Patriot asserts that: (1) Vickery's opinions were not based

11   on factual support; (2) Vickery's unfounded opinions were based on compounded assumptions;

12   (3) Vickery's opinions ignored critical distinctions and rested on speculation; and (4) Patriot was

13   prejudiced by the erroneous admission of Vickery's testimony.  (ECF No. 19–24.)  The Court

14   addresses Patriot's first three contentions below, but declines to address the fourth contention

15   since the following discussion shows that the Court's admission of Vickery's testimony was well

16   founded and properly admitted.

17         i.    *Vickery's Opinions Were Based on Facts*

18        Patriot argues that Vickery's opinions relating to the 2012 sale of Patriot to SteelRiver

19   (the "Sale"), including his conclusions about the "contributory value" of MBP and the investment

20   of proceeds from the Sale, should have been excluded because his opinions were not based on

21   facts, but rather, on a string of unfounded assumptions.  (ECF No. 452, at 19.)

22        First, the Court notes that "the factual basis of an expert opinion goes to the credibility of

23   the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis

24   for the opinion in cross-examination."  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d

25   998, 1017 n.14 (9th Cir. 2004).  *Daubert* requires that the proponent of expert testimony lay a

26   proper foundation in which relevancy and reliability are established, rather than mere general

27   acceptance.  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 466 (9th Cir.) *cert. denied*,

28   135 S. Ct. 55, 190 L. Ed. 2d 30 (2014).  The Court correctly found that Vickery had done so.

1  First, the Court notes that Vickery used EBITDA in determining his damages calculation.

2  There was considerable testimony at trial that railroads regularly sell for a multiple of their

3  EBITDA.  (*E.g.*, Trial Tr. Vol. II, at. 115:21–116:3 (Gary Marino ("Marino"):[3] "The values are

4  determined usually based upon a multiple of EBITDA."); (Vickery's testimony) Trial Tr. Vol. XI,

5  at 1796:8–18.)  Patriot's budgeted EBITDA for the 2012 MBP operations exceeded $1.4 million.

6  Patriot challenges Vickery's conclusion that Patriot realized approximately $10.39 million from

7  the sale of MBP: "MBP represented no value in the Sale" to SteelRiver.  (ECF No. 452-1, at

8  19:22–21:6.)  The Court does not find this argument availing.  It would be absurd for Patriot to

9  give away a profitable operation for free, as explained by Vickery on cross-examination.  (Trial

10  Tr. Vol. XI, at 1785:14–1786:1.)  Additionally, Patriot and SteelRiver identified the MBP

11  contract as a "material contract" in their Stock Purchase Agreement which confirms that they

12  understood the MBP operations to be a "material" component of the transaction.  (Trial Tr. Vol.

13  XI, at 1785:16–20).  Thus, there is a factual basis for Vickery's conclusion that Patriot did not

14  give MBP to SteelRiver for free.

15  Next, Patriot claims two pieces of evidence support its contention that MBP did not

16  contribute to the overall sale price of more than $235 million.  First, Patriot mischaracterizes a

17  statement from the Vickery's Second Supplemental Report ("SSR") as a purported concession

18  that "[Vickery] did not know whether Patriot received any value for MBP."  (ECF No. 452-1, at

19  20:3–5 & n.19 (citing SSR at 74–76).)  In fact, all that Vickery stated was that he "estimated" the

20  amount of value Patriot received for the MBP operation.  (SSR at 75.)  Second, Patriot asserts that

21  Marino testified that MBP "represented no value in the Sale."  (ECF No. 452-1, at 20:9–10.)

22  Patriot again mischaracterizes the evidence and misstates the testimony.  Marino testified that

23  Patriot and SteelRiver never discussed a specific value for MBP during their negotiations, not that

24  it was devoid of value.  (Trial Tr. Vol. XI, at 1755:3–9.)  Therefore, the most reasonable

25  interpretation of the data is that the parties agreed to a price for the package of 13 railroads and

26  did not commit to specific values for each individual railroad.  As such, Vickery was left to

27  estimate the value using an accepted valuation methodology, the EBITDA multiplier

28  _____
[3]  Gary Marino is Patriot's former CEO, chairman, and president.

1    methodology which Patriot itself testified is the prevalent valuation method in the railroad

2    industry.  (Trial Tr. Vol. II, at 115:21–116:3; Vol. IV, at 512:21–514:8.)

3          As to Patriot's argument that the use of a multiplier lacked factual support because "there

4    was no evidence that the Sale was based on a multiplier," (ECF No. 452-1 at 21:7–8), this

5    argument is also a nonstarter.  The calculations do not need to mirror the sale; there simply needs

6    to be a reasonable basis for the computation.  *See Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal.

7    App. 4th 1295, 1305 (2010).

8          Patriot also challenges the factual support for "Vickery's conclusion that Sierra would

9    have sold itself when Patriot did."  (ECF No. 452-1 at 21:9–10.)  The Court cannot find evidence

10   that Vickery made this conclusion, and even if he had this Court finds no relevance of such an

11   assumption to Vickery's expert opinions.

12         Patriot next challenges the factual support for Vickery's conclusion that Patriot would

13   have invested the sale proceeds as Vickery outlined.  It was not unreasonable to assume that

14   Patriot invested the sale proceeds; assuming the contrary would have been unreasonable.

15   Furthermore, Vickery explained at trial (Trial Tr. Vol. XI, at 1801:1–1803:11), at the *Daubert*

16   hearing (*Daubert* Hr'g Tr. 45:9–21) and in his expert report (SSR at 83) his basis for his

17   conclusion.  As Vickery explained, Patriot is "not going to just sit on cash."  (Trial Tr. Vol. XII,

18   at 1929:16–18.)  In support of his conclusion, Vickery pointed to the fact that the SPA provided

19   for rates of return on escrow accounts, which is "indicative of Patriot's desire to achieve a rate of

20   return on monies that are available."  (*Daubert* Hr'g Tr., at 73:11–15.)  Calculating Patriot's rate

21   of return based on the conservative assumption that Patriot—an aggressive flipper of railroad

22   investments—would have put the proceeds in a diversified portfolio of cash, bonds, and stocks

23   was hardly "so fundamentally unsupported that it [could] offer no assistance to the jury."  *Bonner*

24   *v. ISP Tech. Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001); *see also Primiano v. Cook*, 598 F.3d 558,

25   565–566 (9th Cir. 2010) (expert testimony should be admitted if the jury "would accept it as

26   useful and reliable" even though it is not "conclusive"); *Jahn v. Equine Services, PSC*, 233 F.3d

27   382, 393 (6th Cir. 2000) ("[E]xperts are just witnesses, and they need not be purveyors of

28   ultimate truth in order to be allowed on the stand.").

18

1    In challenging the factual support for Vickery's unjust enrichment opinions, Patriot

2    analogizes the instant case to *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 140,

3    143 (4th Cir. 1994).  (ECF No. 452-1, at 20:11–24.)  However, *Tyger* is dissimilar to the instant

4    case.  In *Tyger*, the Fourth Circuit held that the expert's opinion was inadmissible because

5    uncontradicted evidence, including the expert's own admission, explicitly negated the expert's

6    damages theory.  *See id.* at 142–43.  *Tyger* is a textbook example of the exceptional case in which

7    an "expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury

8    [and] must… be excluded."  *Bonner*, 259 F.3d at 929–30.  Here, in contrast, this Court held an

9    extensive *Daubert* Hearing and correctly found that Vickery's testimony was based on sufficient

10    facts and reasonable assumptions.  Thus, the Court finds that Patriot's assertion—that Vickery's

11    opinions should have been excluded because his opinions were based not on facts— is

12    unfounded.  As such, the Court turns to Patriot's argument that Vickery's testimony is based on

13    compound assumptions and thus inherently unreliable.

14                    *ii.    Patriot's Compound Assumptions Argument is Meritless*

15    Patriot asserts that four different assumptions underlying Vickery's testimony, taken

16    together, compounded to "[make] his testimony inherently unreliable."  (ECF No. 452-1, at

17    21:18–20.)  Specifically, Patriot argues that Vickery needed the following pieces of missing

18    information in order to render an admissible opinion: (1) the actual purchase price SteelRiver paid

19    for Patriot; (2) whether MBP contributed any value to that purchase price; (3) how the sale

20    proceeds were distributed; and (4) when those proceeds were distributed.  (ECF No. 452-1, at

21    22:2–5.)  The Court addresses each of these arguments in turn.

22    As to the purchase price, Vickery knew the base price of $230 million, the Earn-Out

23    formula, the EBITDA Threshold level from that formula, and Patriot's 2012-budgeted EBITDA.

24    Vickery used this information to reasonably estimate the final purchase price as between $230

25    million and $260 million.  (See SSR, at 74–76.)  During the punitive damages phase, Sierra

26    learned that the final purchase price was $245 million, exactly in the middle of Vickery's range.

27    (Trial Tr. Vol. XVI, at 2671:22.)  As to Patriot's second assumption, regarding whether MBP

28    added value to the purchase price, this Court has already explained that Vickery's assumption that

19

1    Patriot received value for MBP is well supported by both the evidence and common sense, as is

2    Vickery's calculation of that value.  Finally, with regard to the last two "assumptions," how and

3    when the proceeds were distributed, Vickery reasonably assumed that Patriot received the

4    proceeds on June 18, 2012, the effective date of the sale to SteelRiver.  (See SSR at 67.)

5         The Court finds no error in admitting Vickery's well-reasoned testimony.  Moreover, the

6    Court finds Patriot's assertion—that Vickery's opinions were inadmissible due to information that

7    Patriot withheld—in bad taste.  *See Clemente v. State of Cal.*, 40 Cal. 3d 202, 219 (1985) ("If

8    plaintiff's inability to prove his damages with certainty is due to defendant's actions, the law does

9    not generally require such proof.").  Patriot refused to produce an unredacted version of the SPA

10   and other documents related to the sale, based on privilege and relevance, (*see* ECF No. 336, at

11   1:14–3:3), and now argues that Vickery's testimony is unfounded because he lacked that

12   information.  Patriot's argument is flawed and unavailing.

13              iii.    *Vickery's Opinion Did Not Ignore Critical Distinctions Nor Rest on*

14                      *Speculation*

15        Patriot argues that Vickery ignored critical distinctions and independent variables that

16   necessarily affected the reliability of his conclusion that Sierra could have realized the same value

17   from the Sale of McClellan Park as Patriot.  (ECF No. 452-1 at 23:2–4.)  The testimony that

18   Patriot refers to is as follows:

19              Q.  And that was the contributory value of the McClellan -- for the
                McClellan operation to a sale by Sierra; is that correct?
20
                A. That's correct.
21
                Q. Can you explain in general what that actually means?
22
                A. Yeah. What we were looking at is, I mean, the sort of foundation
23              of -- the start of this case was the sale of Sierra to Patriot going
                back to the mid to late 2000s. And what we were -- what we were
24              analyzing is, if Sierra had McClellan Park as part of its portfolio of
                railroad operations as a larger railroad company, it would have the
25              opportunity to sell its railroad company inclusive of McClellan
                Park.  My understanding is that, you know, Sierra has long been
26              making efforts to try to sell its overall railroad company.  So what I
                wanted to calculate is what additional value has Sierra been
27              deprived by not having, ah, the McClellan Park operations as part
                of its ability to sell its company.
28

1    (*Daubert* Hr'g Tr., at 48:24–49:17.)  This testimony does not support Patriot's assertion that

2    Vickery assumed that Sierra would have received the "same value" for MBP as Patriot.  In fact,

3    Vickery performed an analysis that projected Sierra's lost profits at MBP (*see generally* SSR at

4    85–133), and having performed that analysis, Vickery calculated the 2014 EBITDA value Sierra

5    would derive from still having MBP as part of its portfolio.  (*See* SSR Schedule 14 at 90; SSR at

6    134–150.)  Vickery compared the reasonableness of his EBITDA projections to Sierra's actual

7    historical operating income margin at MBP, (SSR at 95), and noted the differences between

8    Patriot's actual EBITDA value and Sierra's projected EBITDA value.  (SSR at 94 (endnotes to

9    Schedule 14).)

10        It is indisputable that Sierra lost value after failing to keep the MBP operation.  (See Trial

11   Tr. Vol. II, at 284:10–14 (stating that MBP accounted for 45% of Sierra's carloads and 38% of its

12   revenue).)  Thus, Vickery only needed a reasonable method for determining the value of Sierra's

13   loss.  *See GHK Associates v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990) ("Where the

14   fact of damages is certain, the amount of damages need not be calculated with absolute

15   certainty.").  As discussed at length, Vickery reasonably determined the value of this loss using

16   the method most commonly used in the railroad industry, in fact a method used by Patriot itself,

17   to arrive at a calculation that does not require Sierra to actually or potentially be sold.  (See Trial

18   Tr. Vol. III, at 512:21–514:8; Vol. XI, at 1830:18–20 (Vickery testifying he calculated the loss in

19   value "associated with not having the MBP operations as part of its larger railroad company".)

20   Therefore, the Court finds unpersuasive Patriot's argument that Vickery ignored critical

21   distinctions and independent variables.

22        For the reasons discussed, the Court finds that Vickery's testimony was correctly admitted

23   and thus declines to fully address Patriots arguments that it was prejudiced by Vickery's

24   testimony.  In any event, in reviewing Vickery's testimony the Court finds that Patriot was not

25   prejudiced by said testimony.

26        D.    <u>Patriot's Sufficiency Arguments</u>

27        Patriot contends that the jury's findings in relation to each claim [for breach of contract

28   and intentional interference] are against the clear weight of the evidence because "Sierra would

1   not have obtained the MBP contract anyways." (ECF No. 452-1, at 25.)

2          The Court weighs the evidence as the Court saw it and can set aside the jury verdict only

3   if, "in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the

4   evidence." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quotations

5   omitted). "A motion will be granted on this ground only if the verdict is against the great weight

6   of the evidence, or it is quite clear that the jury has reached a seriously erroneous result."

7   *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (internal quotations omitted).

8   Patriot falls far short of showing that any evidence, let alone the "clear weight" of evidence,

9   conflicts with the jury's verdict.

10                  *i.      Causation*

11         Patriot first argues that Sierra did not prove causation because it failed to show that it was

12   reasonably probable that Sierra would have retained the MBP operation, but for Patriot's conduct.

13   (ECF No. 452-1, at 25–28.) Patriot's briefing relies on isolated statements made by Larry Kelley

14   ("Kelley") that fail to accurately portray the evidence presented at trial. At trial, Kelly, the

15   principal and owner of McClellan Park, confirmed that, if Sierra had submitted the best bid, it

16   would have been selected as the winner:

17               Q. So what I'm confused about is if you were so dissatisfied with
                 Sierra's performance, why would you allow them to bid?
18
                 A. Well, there's a couple reasons. One, in the meeting that I had
19               with Mr. Hart, he was somewhat threatening with litigation on
                 some things that related to our dissatisfaction and terminating the
20               contract. And our general counsel felt like the best thing was to let
                 them bid. If [Sierra's] proposal was economically superior, and they
21               were going to do the things as well or better than the other[s], we
                 would go again with them. But it would have to be based upon a
22               superior proposal.

23               Q. But — so if they came through with a superior proposal, you
                 would renew your contract with them; is that right?
24
                 A. If — if it was superior, yes.
25

26   (Trial Tr. Vol. VIII, at 1389:5–20.) Again, Kelly testified that he would have chosen the highest

27   bid, even if it had been Sierra:

28               Q. So no emotions, no hard feelings, no disappointments. If they

had the best proposal, Sierra would get the contract?

A. If economically and operationally — and economics includes capital investment as well as marketing effort, et cetera. Then we would have probably chosen them if they were superior to everybody else.

Q. Now, you've talked a lot about economics.

A. Uh-huh.

Q. So is it true to say that part of the thought process behind going out with this RFP [Request for Proposal] is hopefully to find a shortline railroad who will produce greater economics, greater revenue for you than the one that you presently have conducting those operations; is that right?

A. Yes.

Q. And if, in that RFP process, a couple of the bidders actually came in with revenue or economic proposals that reflected less money coming to McClellan than under the existing contract, that wouldn't bode well for those two bidders; is that right?

A. If they couldn't meet or exceed what we had, then we probably would have to stay with what we got because there's nothing any better.

(Trial Tr. Vol. VIII, at 1391:2–23.)  The evidence presented at trial showed that other than Patriot's bid, Sierra's bid was higher than the others submitted by a substantial sum.  (*See* Ex. 423 (*compare* Cal. Northern—$133,000 based on 4,000 cars and Portland & Western—$120,000 based on 4,000 cars *with* what Sierra paid to MBP in 2006—$173,000 with only 3,526 cars).)  Patriot's reliance on a few handpicked and misleading statements from Kelley's testimony cannot overcome the fact that Kelley himself confirmed that MBP would have chosen the best bid submitted.

In addition, Frank Myers,[4] clearly stated that Sierra would have won but for Patriot's bid: "I think Sierra Northern was close, as you can tell from these numbers, but as I recall, Portland & Western was out of the running.  California Northern also."  (Myers Dep. Tr. 135:5–10 (played for the jury on Mar. 19, 2014), at Trial Tr. Vol. VIII, at 1408:23–25.)  In sum, the facts presented to the jury were that the best bid, aside from Patriot's bid, was Sierra's bid.

---

[4]      At trial, Frank Myers testified as a Rule 30(b)(6) witness, designated to speak on behalf of MBP.

1                     ii.        Misappropriation

2           Patriot challenges the misappropriation verdict on the grounds that: (1) carload data was

3   not a trade secret; (2) MBP did not consider the 2006 revenue confidential; (3) Sierra disclosed

4   information to Morrison and MBP without a NDA; and (4) no evidence suggests that Patriot won

5   the bid because of any allegedly misappropriated information.  (ECF No. 452-1, at 29.)

6           In its first two assertions, Patriot mischaracterizes the MBP testimony regarding what was

7   not confidential.  (*See* Trial Tr. Vol. VIII, at 1341:1–10 (Myers testifying that "generic carload"

8   information would be fair game).)  Sierra did not contend that the generic carload information

9   shared with all bidders was a trade secret.  However, Sierra's 2006 revenue at MBP was a trade

10  secret and MBP treated it as Sierra's confidential information.  (*See* Debra Compton[5] Dep.

11  (testifying by video), at 125:10–126:3 (stating that Sierra's "business information" was

12  confidential, and she would not have released such information to any bidder without Sierra's

13  authorization); J. Marino Dep., at 59:21–60:3; 60:15–18; 62:20–63:10 (played to jury on Mar. 21,

14  2014 at Trial Tr., Vol 10, at 1520:25–1521:2 (testifying that "revenues," "operation information,"

15  and information provided under an NDA are considered confidential in the railroad industry).)

16          As to Patriot's third assertion, Patriot ignores the verbal assurances from Larry Kelley, Jay

17  Heckenlively, and Deborah Compton—memorialized in writing without objection from MBP—

18  that MBP would not disclose Sierra's information without Sierra's consent.  (*See* Ex. C-2 (July 2,

19  2007 cover letter for Sierra's June 2007 Proposal to MBP).)  Sierra refused to provide this

20  information to MBP until it received these assurances.  (*See* Trial Tr. Vol. VIII, at 1422:17–

21  1426:14; see also Ex. X-1 (disclaimer on the cover of the proposal stating it was provided

22  "[u]nder agreement with [MBP]" that no information contained in the document would be

23  "disclosed to any third parties without [Sierra's] express prior written agreement").)  In fact,

24  Debra Compton also confirmed that she would not disclose such information without Sierra's

25  consent. (Compton Dep. 125:10–126:3.)

26          Lastly, Sierra proved that Patriot's misappropriation directly resulted in Patriot securing

27  the MBP contract to Sierra's harm and Patriot's benefit.  Sierra showed it would have been

28  _____
    [5]        At the time of trial Debra Compton's name was Debra Harrell.

1   selected, but for Patriot.  However, assuming arguendo that Sierra had not proven it would have

2   been selected, it can prevail on its misappropriation claim under an unjust enrichment theory

3   whether or not it proved Sierra would have won but for Patriot.  *See Unilogic, Inc. v. Burroughs*

4   *Corp.*, 10 Cal. App. 4th 612, 628 (1992) (in some "situations, a benefit has been received by the

5   defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but

6   nevertheless the enrichment of the defendant would be unjust.  In such cases, the defendant may

7   be under a duty to give to the plaintiff the amount by which he has been enriched.").  Thus, Sierra

8   need only show that the misappropriation was a substantial factor in Patriot's enrichment.  (Instr.

9   No. 32, part 5, ECF No. 442.)

10      Sierra proved that Patriot's knowledge and use of its trade secrets formed the basis for

11   Patriot developing an economically superior bid.  (*See, e.g.*, Ex. Z-3, at 4 (identifying Sierra's

12   payment of $173,000 to MBP); Exs. U-1 and X-1 (identifying Sierra's 2006 gross revenue at

13   MBP).)  Other evidence included the 15% to 18% revenue sharing rates (*compare* Trial Ex. X-1,

14   at 9 *with* Trial Ex. Z-3, at 4; *see also* Trial Ex. A-4, at 2 and Ex. B-4, at 1, 14) and the capital

15   investment offered to MBP (*compare* Trial Ex. X-1, at 7 *with* Trial Ex. Z-3, at 28; *see also* Trial

16   Ex. A-4, at 7, Ex. B-4, at 16, and Trial Tr. Vol. XIII, at 1321:15–1322:3 (maintenance budget is

17   not a capital investment)); *see also* Trial Tr. Vol. XIII, at 1304:11–1315:23.)  The facts clearly

18   support the jury's verdict as to the misappropriation claim.

19                              *iii.*      *Breach of Contract*

20      Patriot challenges the verdict on Sierra's breach of contract claim asserting that there was

21   no breach.  Patriot position is not supported by the evidence.  Patriot violated the NDA by using

22   confidential information it obtained during negotiations for purposes other than evaluating and

23   negotiating the purchase of Sierra.  (See Ex. F-1 (under the NDA, Patriot may only use the

24   information in "evaluating and negotiating" Patriot's possible acquisition of Sierra).)  Throughout

25   the trial, Sierra provided numerous examples of Patriot's misuse of Sierra's information, which

26   supports the jury's determination.  (*See, e.g.*, Ex. A-2; Trial Tr. Vol. VI at 1036:8–1037:5

27   (Patriot's use of information to inform it of MBP's priorities in order to win the bid).)

28   Furthermore, the NDA was not limited to trade secrets.  (*See* Ex. F-1 (Confidential Information

1  includes "all information about the Company or any of its … affiliates.").)  The NDA also

2  prohibited Patriot from contacting Sierra's customers (i.e. MBP) without Sierra's permission.

3  (Ex. F-1.)  However, that did not stop Patriot from independently contacting MBP in violation of

4  the NDA.  (*See* Trial Tr. Vol. XII, at 1957:11–18 (McCarthy met with MBP and wanted to "spend

5  as much time with the MBP people as possible"); 1985:20–1986:2; 1994:25–1995:8 (McCarthy's

6  sole purpose was to obtain the MBP contract for Patriot and in competition with Sierra).)  The

7  facts support the verdict on Sierra's breach of contract claim

8          *iv.*    *Interference*

9       Patriot's sole basis for challenging the interference claims is that Patriot did not engage in

10  any independently wrongful conduct.  (ECF No. 452-1 at 29–30.)  This Court wholeheartedly

11  disagrees.  Patriot repeatedly misled Sierra.  In fact, not only did Patriot secretly bid using

12  Sierra's confidential information, it also tricked Sierra into bidding less.  Mr. Marino suggested to

13  Mr. Hart that he lower Sierra's $1–1.2 million capital investment offer to McClellan because it

14  was "too high" and would "cost [Sierra] in the purchase price."  (Trial Tr. Vol. VII, at 1059:6–

15  19.)  Based on Marino's suggestions, Sierra reduced its offer to $500,000, while Patriot offered

16  $1 million.  (Trial Tr. Vol. VII, at 1059:6–19.)  Patriot never retracted or corrected these

17  misrepresentations even after they submitted their own bid on November 15.  (Trial Tr. Vol. VII,

18  at 1083:17–1084:15.)  Patriot's actions were done purposefully, which was evidenced by Patriot's

19  own witness and vice president in charge of business development, Paul McCarthy, who testified

20  that Patriot viewed Sierra as a "threat" and Patriot's target was now McClellan.  (*See* Trial Tr.

21  Vol. XII, at 1950:20–23, 1953:4-5, 1985:20–1986:2, 1995:7–8.)  Based on this evidence, the

22  Court finds that the jury correctly found independent wrongful conduct on the part of Patriot.

23      **IV.**   **CONCLUSION**

24       For the foregoing reasons, the Court finds that the jury's verdict was supported by the

25  record and Patriot's Motion for a New Trial (ECF No. 452-1) is DENIED.

26          IT IS SO ORDERED.

27  Dated:  August 4, 2015

28

                                    Troy L. Nunley
                                    United States District Judge