1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11    PATRIOT RAIL CORP.,                    No.  2:09-cv-0009-TLN-AC

12             Plaintiff,

13        v.                                 **ORDER DENYING PATRIOT'S RULE
                                             50(b) AND RULE 59 MOTIONS**
14    SIERRA RAILROAD CO.,

15             Defendant.

16
      AND RELATED COUNTERCLAIMS
17

18

19          This matter is before the Court pursuant to Plaintiff and Counter-Defendant Patriot

20    Corporation's ("Patriot") Motion for Judgment as a Matter of Law or Alternatively Motion for

21    New Trial as to the Jury's Punitive Damages Award (ECF No. 535) and Patriot's Rule 50(b)

22    Motion as to liability (ECF No. 536).  Defendant and Counter-Plaintiff Sierra Railroad Company

23    ("Sierra") has filed oppositions to both of Patriot's respective motions (ECF Nos. 547; 552), and

24    Patriot has replied to both oppositions (ECF Nos. 547; 552).  The Court has carefully considered

25    the briefing filed by both parties.  For the following reasons, Patriot's Motion for Judgment as a

26    Matter of Law or Alternatively Motion for New Trial as to the Jury's Punitive Damages Award

27    (ECF No. 535) and Patriot's Rule 50(b) Motion (ECF No. 536) are hereby DENIED.

28    ///

                                             1

## I.   FACTUAL BACKGROUND

On March 28, 2014, a jury awarded Sierra compensatory damages in the amount of $22,282,000 for breaching a non-disclosure agreement (the "NDA") between the parties.  (Jury Verdict, ECF No. 447.)   The jury also found that Patriot misappropriated Sierra's trade secrets and that "one or more officers, directors, or managing agents of Patriot acted willfully and maliciously is misappropriating Sierra's trade secrets."  (ECF No. 447.)  After the liability phase of the trial, the issue of exemplary damages was tried before the jury.  At the conclusion, the jury awarded Sierra exemplary damages for Sierra's intentional interference claim in the amount of $16,200,000 against Patriot Rail Corp./Company LLC and $1,200,000 against Patriot Rail LLC/ Pacific Rail LLC.  (ECF No. 482.)  In a separate order, the Court awarded Sierra $13,144,465 in exemplary damages on Sierra's misappropriation of trade secrets claim against Patriot Rail Corp./Company LLC, separate and apart from the jury's punitive damages verdict on the interference claim.  (ECF No. 522.)

Patriot has moved for Judgment as a matter of law or alternatively motion for new trial (ECF No. 535) arguing as follows: (i) the Court should have applied *In Re Asbestos* and found that Patriot should not have been punished because it is a successor entity; (2) Sierra's counsel made improper incurable arguments at trial that prejudiced the jury; (3) the jury's punitive damages award is not supported by the record; and (4) the award is unconstitutional.  Patriot has also moved to alter or amend the judgment under Fed. R. Civ. P. 59(e).  Plaintiff argues in its separate Rule 50(b) motion (ECF No. 536) as follows : (1) no reasonable jury could have found for Sierra on its interference claims; (2) Sierra failed to prove a basis for damages on its interference claim; (3) Sierra failed to prove that Patriot caused Sierra harm; (4) Sierra failed to prove that Patriot improperly acquired, used or disclosed Sierra's trade secret information; and (5) Sierra failed to prove Patriot breached the NDA.

## II.   LEGAL STANDARD

### A.   Rule 50(b)

A Rule 50(a) motion tests the sufficiency of the evidence offered in support of a party's claims.  *Keenan v. Computer Assocs. Int'l*, 13 F.3d 1266, 1268–69 (8th Cir. 1994).  Judgment as a

1   matter of law is proper if that evidence, construed in the light most favorable to the moving party,

2   allows only one reasonable conclusion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–

3   51, 255 (1986). A motion for judgment as a matter of law should be granted only if the facts and

4   inferences point so strongly and overwhelmingly in favor of one party that a decision in that

5   party's favor is mandated.  *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 (5th Cir.

6   1996).

7       "Rule 50 requires a party seeking judgment as a matter of law to file a Rule 50(a) motion

8   at any time before the case is submitted to the jury.  If the jury later returns a verdict against the

9   moving party, this party may then file a Rule 50(b) motion for judgment as a matter of law."

10  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009).  Rule 50(b), by its

11  terms, allows a party, after trial, to "renew" a motion for judgment as a matter of law "made at the

12  close of all the evidence."  Therefore, a party cannot raise arguments in its post-trial Rule 50(b)

13  motion that it did not raise beforehand in a Rule 50(a) motion offered during trial itself.  *See*

14  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

15                    B.    Rule 59

16      Rule 59(a)(1)(A) provides that a court may "grant a new trial on all or some of the issues

17  and to any party after a jury trial, for any reason for which a new trial has heretofore been granted

18  in an action at law in federal court.  "Rule 59 does not specify the grounds on which a motion for

19  a new trial may be granted."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir.

20  2003).  "Rather, the court is 'bound by those grounds that have been historically recognized.'"

21  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *id.*).  Recognized grounds

22  include, but are not limited to, allegations "that the verdict is against the weight of the evidence,

23  that the damages are excessive, or that, for other reasons, the trial was not fair to the party

24  moving."  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  The Ninth Circuit has

25  held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight

26  of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."

27  *Molski*, 481 F.3d at 729; (*quoting Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d

28  493, 510 n. 15 (9th Cir. 2000)).  "Upon the Rule 59 motion of the party against whom a verdict

1  has been returned, the district court has 'the duty to weigh the evidence as the court saw it, and to

2  set aside the verdict of the jury, even though supported by substantial evidence, where, in the

3  court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.'"

4  *Molski*, 481 F.3d at 729 (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir.

5  1990)).

6  **III.    LEGAL ANALYSIS**

7       At the outset, the Court notes that Sierra argues that Patriot is estopped from moving

8  under Rule 50(b) because Patriot did not make a Rule 50(a) motion with respect to the punitive

9  damages phase.  (ECF No. 552 at 3.)  However, Patriot did file a Rule 50(a) motion as to the

10  merits of Sierra's claims against Patriot.  (*See* Mot. for Judgment as a Matter of Law, ECF No.

11  434.)  The Court does not find that Patriot's failure to make an additional Rule 50(a) motion prior

12  to the jury's separate deliberation as to punitive damages bars the current motions before this

13  Court.  As such, the Court turns to the substantive arguments raised by Patriot.  In doing so, the

14  Court first discusses Patriot's arguments concerning deficient evidence in support of the jury's

15  finding that Patriot committed: (1) intentional interference; (2) misappropriation of trade secrets;

16  and (3) a breach of the NDA.  The Court then turns to Patriot's arguments concerning punitive

17  damages.

18       A.    <u>Intentional Interference</u>

19       In order to succeed on a claim for economic interference a party must show: (1) an

20  economic relationship that probably would have resulted in an economic benefit; (2) the

21  offending party knew of that relationship; (3) the offending party engaged in wrongful conduct;

22  (4) the relationship was disrupted; (5) the moving party was harmed; and (6) that the wrongful

23  conduct was a substantial factor in causing the moving party's harm.  *Youst v. Longo*, 43 Cal.3d

24  64, 71 n.6 (1987); *accord N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 786 (1997).  In

25  addition, a claim for intentional interference requires a showing that Patriot intended to disrupt

26  the relationship, *Youst*, 43 Cal. 3d at 71 n.6, while a claim of negligent interference requires a

27  showing that the tortfeasor knew or should have known that the relationship would be disrupted if

28  he or she failed to act with reasonable care.  *N. Am. Chem. Co.*, 59 Cal. App. 4th at 786.

4

Patriot asserts that Sierra failed to show that it had an economic relationship with McClellan Business Park ("MBP") and that Sierra failed to prove a competent basis for its alleged damages.  (ECF No. 536 at 5–6.)  Essentially, Patriot argues that had Patriot not bid on the MBP contract, Sierra would not have won the bid for the business.  This Court disagrees.

At trial, Larry Kelley ("Kelly"), the principal and owner of McClellan Park, confirmed that, if Sierra had submitted the best bid, it would have been selected as the winner:

> Q. So what I'm confused about is if you were so dissatisfied with Sierra's performance, why would you allow them to bid?
>
> A. Well, there's a couple reasons. One, in the meeting that I had with Mr. Hart, he was somewhat threatening with litigation on some things that related to our dissatisfaction and terminating the contract.  And our general counsel felt like the best thing was to let them bid. If [Sierra's] proposal was economically superior, and they were going to do the things as well or better than the other[s], we would go again with them. But it would have to be based upon a superior proposal.
>
> Q. But — so if they came through with a superior proposal, you would renew your contract with them; is that right?
>
> A. If — if it was superior, yes.

(Trial Tr. Vol. 8, at 1389:5–20.)  Again, Kelly testified that he would have chosen the highest bid, even if it had been Sierra:

> Q. So no emotions, no hard feelings, no disappointments. If they had the best proposal, Sierra would get the contract?
>
> A. If economically and operationally — and economics includes capital investment as well as marketing effort, et cetera.  Then we would have probably chosen them if they were superior to everybody else.
>
> Q. Now, you've talked a lot about economics.
>
> A. Uh-huh.
>
> Q. So is it true to say that part of the thought process behind going out with this RFP [Request for Proposal] is hopefully to find a shortline railroad who will produce greater economics, greater revenue for you than the one that you presently have conducting those operations; is that right?
>
> A. Yes.
>
> Q. And if, in that RFP process, a couple of the bidders actually

1    came in with revenue or economic proposals that reflected less
2    money coming to McClellan than under the existing contract, that
     wouldn't bode well for those two bidders; is that right?

3    A. If they couldn't meet or exceed what we had, then we probably
     would have to stay with what we got because there's nothing any
4    better.

5    (Trial Tr. Vol. 8, at 1391:2–23.)  The evidence presented at trial showed that other than Patriot's

6    bid, Sierra was higher than the others submitted by a substantial sum.  *See* Ex. 423 (Compare Cal.

7    Northern—$133,000 based on 4,000 cars and Portland & Western—$120,000 based on 4,000

8    cars with what Sierra paid to MBP in 2006—$173,000 with only 3,526 cars.)

9    In addition, Mr. Frank Myers[1] ("Myers"), clearly stated that Sierra would have won but

10   for Patriot's bid: "I think Sierra Northern was close, as you can tell from these numbers, but as I

11   recall, Portland & Western was out of the running.  California Northern also."  (Myers Dep. Tr.

12   135:5–10 (played for the jury on Mar. 19, 2014, at Trial Tr. Vol. 8, at 1408:23–25).)  Myers

13   confirmed, with the other two bidders out based on economically inferior proposals, had Patriot

14   not bid, Sierra would have won the bid.  Thus, in contrast to Patriot's assertions, there was

15   evidence supporting the jury's finding that: Sierra and McClellan Business Park were in an

16   economic relationship that probably would have resulted in an economic benefit to Sierra; the

17   relationship was disrupted; Sierra was harmed; and Patriot's conduct was a substantial factor in

18   causing Sierra's harm.  Thus, Patriot has not shown that there was a "complete absence of

19   probative facts to support the [jury's] conclusion."  *Eich v. Bd. of Regents for Cent. Missouri*

20   *State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003).

21   It is unclear to the Court whether Patriot argues that Sierra failed to prove wrongful

22   conduct in reference to its interference claim.  If that is Patriot's argument, the Court finds this

23   assertion contrary to the evidence presented at trial.  To establish the wrongful conduct element,

24   the aggrieved party must show some independently wrongful act—that is, an act that "is

25   'proscribed by some constitutional, statutory, regulatory, common law, or other determinable

26   legal standard.'"  *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1545 (2007)

27

---

28   [1]    At trial, Frank Myers testified as a Rule 30(b)(6) witness, designated to speak on behalf of MBP.  (Trial Tr. Vol 8, at 1283:18–1284:8.)

1   (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)).  To prove

2   this, Sierra was required to prove the elements of either intentional or negligent

3   misrepresentation: (1) that Patriot represented to Sierra that an important fact was true; (2) that

4   Patriot's representation was false; (3) that Patriot knew that the representation was false when it

5   made it, or that it made the representation recklessly and without regard for its truth; (4) that

6   Patriot intended that Sierra rely on the representation; (5) that Sierra reasonably relied on Patriot's

7   representation; (6) that Sierra was harmed; and (7) that Sierra's reliance on Patriot's

8   representation was a substantial factor in causing its harm.  (ECF No. 442 at 50–51 (CACI 1900;

9   CACI 1903).)  Sierra submitted more than substantial evidence in support of each of these factors.

10          As to the first element— that Patriot represented to Sierra that an important fact was true

11   —there was evidence that Patriot made such a representation to Sierra on two separate occasions.

12   Patriot stated that it would not and could not submit a bid for the McClellan contract except on

13   Sierra's behalf, as a "second bite at the apple" in: (1) an August 16, 2007, phone call between Mr.

14   Stan Wlotko[2] ("Wlotko") and Mr. Michael Hart[3] ("Hart"); and (2) an August 28, 2007, phone call

15   between Mr. Gary Marino[4] ("Marino") and Hart.  (Trial Tr. Vol. 8, at 1040:24–1043:10; 1058:1–

16   1061:15 (Hart).)  As to the second element, the jury could have found that these representations

17   were false, and intentionally, recklessly, or negligently so, as proved by the testimony of Mr. Paul

18   McCarthy ("McCarthy").[5]  McCarthy stated that Patriot—without making him aware that it was

19   holding acquisition discussions with Sierra—sent him to McClellan to try to take the McClellan

20   contract for Patriot, and from Sierra, whom he viewed as a "threat."  (Trial Tr. Vol 12, at

21   1985:20–1986:24; 1995:7–8 (McCarthy).)  Clearly Patriot's representation to Sierra that it was

22   only submitting a bid for McClellan on behalf of Sierra was an important fact, which was false

23   since Patriot was making its own independent bid for McClellan.

24          As to the third element, Patriot knew that the representation to Sierra was false since

---

25   [2]      Stan Wlotko was a high-level executive at Patriot, who was in charge of authoring the bid for the McClellan
26   contract.
    [3]      Michael Hart was employed as CEO of Sierra throughout the time period leading up to the trial and to this
27   Court's knowledge is still employed as the CEO of Sierra.
    [4]      Gary Marino is Patriot's former CEO, chairman, and president.
28   [5]      Paul McCarthy testified that he was in charge of business development at Patriot Rail and involved in
    virtually all of the business development projects at Patriot Rail.  (Trial Tr. Vol 12, 1950:20–23.)

1    McCarthy was specifically directed to take the McClellan contract for Patriot, not for Sierra who

2    Patriot viewed as a threat as to the McClellan contract.

3            The fourth element, that Patriot intended that Sierra rely on the representation, is shown

4    by Marino's admonition to Hart to reduce Sierra's capital commitment in its bid because the

5    approximately $1,000,000–$1,200,000 Sierra was planning to propose was unnecessarily high,

6    and would come out of the eventual purchase price of Sierra.  (Trial Tr. Vol. 7, at 1058:1–

7    1061:15 (Hart).)   In doing so, Marino stated to Hart that "he knew [Patriot] couldn't do anything

8    at McClellan without us."  (Trial Tr. Vol. 7, at 1058:12–14 (Hart).)  The evidence established that

9    Patriot intended for Sierra to reduce its capital commitment for the McClellan opportunity while

10   Sierra was under the belief that Patriot's intent in asking Hart to do so was to help Sierra's bid.

11           The fifth element is met by Sierra's reliance on Patriot's representations, which is

12   evidenced by Sierra reducing its capital investment proposal to $500,000 over ten years and

13   proceeding in the bidding process for several more weeks under the assumption that Patriot was

14   its partner, not its competitor.  (Trial Tr. Vol. 7, at 1058:1–1061:15 (Hart).)  Sierra also

15   detrimentally relied on Patriot's representations in that Sierra did not attempt to make Patriot

16   cease and desist its participation in the bidding process.  Because Sierra was unaware that Patriot

17   had submitted a bid on its own behalf and was under the false impression that Patriot would not

18   participate in the bidding except on Sierra's behalf, Sierra bid less than it had originally planned

19   to which contributed to Patriot winning the McClellan contract.

20           As to the sixth element, harm, Sierra was harmed because it lost the bid and everything

21   that they would otherwise derive from a successful bid.  Lastly, the seventh factor is met because

22   Sierra's reliance on Patriot's misrepresentations was a substantial factor in causing its harm:

23   Sierra's chances at winning the bid fell with its reduced capital investment proposal.  Essentially,

24   the evidence showed that Patriot and Sierra represented the two most competitive bids, and but

25   for Patriots representations to Hart, Sierra could have put forth a more competitive bid.  Because

26   the jury could have found that Patriot's many misrepresentations satisfied the elements of both

27   intentional and negligent misrepresentation, there was more than sufficient evidence for a

28   reasonable jury to find that Patriot committed a wrongful act as an element of Sierra's

1    interference claims.

2          As to Patriot's argument that Sierra failed to demonstrate damages, the Court finds that

3    this argument may have been waived since it was absent from Patriots Rule 50(a) motion.

4    However, even if it is proper, it fails on the merits because Sierra presented substantial evidence

5    on the issue of damages as to its interference claims.  (*See, e.g.*, Trial Tr.  Vol. 2, at 284:10–14

6    (Hart) (explaining that in losing the McClellan contract, Sierra lost a "huge" portion if its

7    business – forty-five percent of the cars moved and thirty-eight percent of its revenue); Trial Tr.

8    Vol 11, at 1827:14–1830:3 (Vickery) ($4,282,000 in lost profits).)  In essence, Patriot asks this

9    Court to overrule the jury's credibility finding as to Sierra's damages, and this Court declines to

10   do so.  Therefore, Patriot's Rule 50(b) motion is DENIED as to this cause of action.

11         B.       Misappropriation of Trade Secrets

12         To successfully prove misappropriation of its trade secrets under the California Uniform

13   Trade Secrets Act, Cal. Civ. Code § 3426.1 (CUTSA), Sierra was required to establish "(1) the

14   misappropriated information constitutes a trade secret, (2) [Patriot] 'used' the trade secret, and (3)

15   [Sierra] was actually damaged by the misappropriation or [Patriot] was unjustly enriched by such

16   misappropriation and use."  *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991,

17   999 (E.D. Cal. 2007); *accord Brocade Comm'cns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp.

18   2d 1192, 1212 (N.D. Cal. 2012).  Patriot asserts that Sierra did not prove that Patriot improperly

19   acquired, used, or disclosed any of Sierra's trade secret information, or that Sierra suffered any

20   harm.  (ECF No. 536 at 6–7.)  The Court finds Patriot's arguments unsupported by the evidence

21   adduced at trial.

22         i.       *The Misappropriated Information Constitutes a Trade Secret*

23         Patriot argues that the $173,000 figure is not a trade secret because, purportedly,

24   McClellan did not consider such information to be confidential, the information was not secret,

25   and Sierra failed to make reasonable efforts to keep the information secret.  (ECF No. 536 at 9.)

26   In support, Patriot cites the trial testimony of Myers's and characterizes his testimony as meaning

27   that McClellan "did not consider historical financial data, such as its freight revenues, to be

28   confidential."  However, in reviewing Myers's full testimony on this topic, the Court finds that

                                                    9

1   Patriot mischaracterizes Myers's testimony:

2       Q. And that kind of financial information would be confidential, so
        that's a reason not to answer --

3

4       A. No, I don't believe the prior performance, the track -- the rail car
        generation in particular, the car -- I don't think we would have
        considered that confidential. Our historical operations out there

5       would have been something that we -- I believe we would have
        considered fair game. We would want to share --

6
        Q. Generic carloads you mean?
7
        A. That's essentially the root of the information, yeah.
8

9   (Trial Tr. Vol. 8, at 1341:1–10.)  Myers did not say "historical financial data, such as freight

10  revenue" is not confidential, and he certainly never said Sierra's $173,000 payment to McClellan

11  was not confidential.  Rather, Mr. Myers equivocated, spoke vaguely, and settled on "generic

12  carloads" not being confidential.  Moreover, the Court finds Patriot's assertion disingenuous in

13  light of the testimony of its own witness Marino, who testified that "revenues," "operation

14  information," and information provided under an NDA are considered confidential in the railroad

15  industry.  (J. Marino Dep. at 59:21–60:3; 60:15–18; 62:20–63:10 (played to jury on Mar. 21,

16  2014 at Trial Tr. Vol 10, at 1520:25–1521:2); *see also* Debra Compton[6] dep. (testifying by video

17  deposition), at 125:10-126:3 (stating that Sierra's "business information" was confidential, and

18  she would not have released such information to any bidder without Sierra's authorization).)

19  Furthermore, to the extent that Patriot's briefing infers that Sierra's information was available

20  online and thus not a trade secret, it misconstrues Myers's testimony.  Myers's actual testimony

21  shows that he did not testify that Sierra's revenue-sharing payment to McClellan of $173,000 for

22  2006 was available on the Internet.  Rather, he testified that "some [McClellan] information" is

23  "out there" which on its face has no relevant evidentiary meaning.  (Trial Tr. Vol. 8, at 1342:3–7.)

24          Similarly, Patriot's claim—that Sierra did not make reasonable efforts to keep revenue data

25  secret—is meritless.  Patriot attempts to cleverly support its argument by asserting that Sierra did not

26  require MBP to sign an NDA.  First, Sierra and MBP were not competitors.  Second, Sierra did

27

28  [6]      At the time of trial Debra Compton's name was Debra Harrell.

request that MBP keep its proposal confidential.  Dave Magaw's ("Magaw")[7] July 2, 2007 letter to McClellan President, Larry Kelley, states as follows:

> I also wish to thank you for your assurances as I understand, and those of Jay Heckenlively and Deborah Compton, that you will not disclose our proposal, or the information contained in it, to any third parties without our consent.   Our proposal contains confidential, proprietary, and trade secret information, the disclosure of which would harm Sierra Northern Railway and its affiliates. With those assurances, I have no concerns about providing you with the enclosed copies of our proposal.

(Ex. C-2 (attaching a copy of Sierra's June 13, 2007 proposal, which is the only document in evidence dated before the November 2007 bid deadline containing the $173,000 figure).)  Magaw also testified that they had extensive negotiations with MBP before submitting their proposal due to confidentiality concerns:

> A. When we first offered to deliver the June 13 – the June proposal, there was issues over confidentiality. And --
>
> Q. What issues specifically?
>
> A. McClellan Park did not want to sign the confidentiality block that they had.
>
> Q. Okay.
>
> A. So we did not deliver it at that time. I believe we later reached an agreement with them that, in fact, they intended to keep it confidential, but would not require a signature, and we then delivered this proposal.

(Trial Tr. Vol. 8, at 1422:20–1423:1.)   Finally, Patriot ignores all of the steps that Sierra took to maintain the confidentiality of its trade secrets.  (*See, e.g.*, Trial Tr. Vol. 7, at 1047:16–1048:1 (Hart) (password protection, separate accounts, secure server, limited access on "a need to know basis," confidentiality training for employees).)  Thus, Patriot cannot prevail on its argument that no reasonable jury could have a legally sufficient evidentiary basis to find that Sierra made reasonable efforts to keep the $173,000 figure secret.

> ii.     *Patriot Used the Trade Secrets*

Patriot explicitly used Sierra's $173,000 payment to McClellan in its bid for the McClellan

---

[7]     David McGaw is Sierra's president.

11

1    contract.  (Ex. Z-3, at 4.)  Patriot then used Sierra's 2006 payment to select its $225,000 annual

2    revenue guarantee, which testimony showed was a primary reason Patriot was able to outbid Sierra

3    and win the McClellan contract.  (Trial Tr. Vol. 8, at 1311:20–24.)  Additionally, Patriot's bid

4    contained the following sentence: "The loss of a customer like Glass Mountain Pumice would be a

5    major setback in reaching our revenue goals."  (Ex. Z-3, at 8.)  Without knowing Sierra's carloads by

6    customer, which Sierra shared with Patriot in both its June 8, 2007 marketing package and June 13,

7    2007 proposal, Patriot could not make this statement as it demonstrates knowledge of the relative

8    carloads and revenues by customer at McClellan.  (Ex. U-1, at 24; Ex. X-1, at 10 (showing that Glass

9    Mountain was the second-highest revenue generating rail customer at McClellan in 2006).)  The

10   evidence presented at trial demonstrates that Patriot could only have obtained this revenue

11   number from Sierra's June 13, 2007, proposal to McClellan.  (Ex. X-1, at 9 ($172,583).)

12   Furthermore, it is unrebutted that Sierra gave this proposal—which contains Patriot Rail Corp.

13   ("PRC") bates stamps on every page as well as a "CONFIDENTIAL" stamp on its cover—to

14   Patriot at a June 13, 2007, meeting at the Sacramento Executive Airport pursuant to the parties'

15   September 29, 2005 non-disclosure agreement (Ex. F-1).  (Trial Tr. Vol. 6, at 875:15–876:7;

16   1045:6–17.)

17        iii.    *Sierra was Damaged by the Misappropriation/ Patriot was Unjustly Enriched by*

18              *the Misappropriation and Use*

19        Sierra's harm and Patriot's unjust enrichment stem from Patriot's misappropriation of

20   Sierra's trade secrets to steal the McClellan contract.  Patriot used the 2006 total revenue figure,

21   Sierra's $173,000 payment to McClellan in 2006, and the 2006 carload by customer data, to both

22   generate and draw attention to Patriot's financial projections.  A reasonable jury could conclude

23   that Patriot's acts were a "substantial factor in causing Sierra's harm or causing Patriot to be

24   unjustly enriched."

25        The evidence presented to the jury clearly showed that Sierra's bid was substantially

26   superior to the proposals of both California Northern and Portland & Western in every economic

27   and operational category important to McClellan, including income to McClellan, capital

28   investment, and on-site marketing.  For example, in comparing the three bids, the Court notes that

                                            12

1   the income to McClellan based on the first year revenues from Sierra's bid would have yielded

2   $234,000 revenue to McClellan in year one of the contract, while California Northern and

3   Portland & Western would yield $133,000 and $120,000, respectively.[8] (Trial Tr. Vol 8, at

4   1313:3–1314:10.)  Similarly, Sierra's five year revenue was the highest: Sierra's bid would have

5   yielded $1,170,000 over the first five years in comparison to $665,000 for California Northern

6   and $600,000 for Portland & Western.  (Trial Tr. Vol. 8, at 1313:3–1314:10.)  Sierra's bid was

7   also superior concerning capital investment: Sierra guaranteed $500,000 for capital investments

8   over 10 years, whereas California Northern and Portland & Western's bids contained no specific

9   commitments to contribute any amount of money to capital improvements.  (Trial Tr. Vol. 8, at

10  1314:17–1315:18; 1317:17–25.)  Lastly, Sierra promised an on-site marketing person while both

11  California Northern and Portland & Western did not.  (Ex. C-4, at 26; Ex. B-4; Ex. A-4.)

12          These bids, in conjunction with Kelly's testimony that he would have hired the company

13  that offered the highest economic advantage, support the jury's finding that but for Patriot's bid,

14  Sierra would have received the contract.  (*See* Trial Tr. Vol 8, at 1391:16–23 (Kelley stating "if

15  [other bidders] couldn't meet or exceed what we had, then we probably would have to stay with

16  what we got because there's nothing any better").)  Thus, the Court finds that the jury's finding

17  that Patriot misappropriated Sierra's trade secrets is supported by the record and this Court

18  DENIES Patriot's Rule 50(b) motion as to this cause of action.

19          C.      Breach of the NDA

20          Patriot again argues that Sierra failed to prove that Patriot breached the 2005 NDA.  In its

21  renewed motion, Patriot contends that Sierra's 2006 total carload data was not confidential, that

22  Sierra cannot base its breach of contract claim on Patriot having access to its 2006 revenue figure

23  of $894,777, and that Sierra presented no evidence that Patriot contacted any of Sierra's

24  customers during the RFP process.  (ECF No. 536 at 11.)  The Court disagrees and finds for the

25  reasons listed below that the jury was presented with more than enough evidence for it to

26  reasonably conclude that Patriot breached the NDA on multiple grounds.

---

27  [8]     McClellan calculated each bidder's proposed revenue sharing based on 4,000 carloads to allow it to compare
28  apples to apples given that each bidder proposed a different revenue sharing mechanism.  (Trial Tr. Vol. 8, at
    1304:17–1305:19.)

The language in the NDA is unambiguous.  Under the NDA, Patriot agreed to hold in confidence Sierra's "Confidential Information"—defined (with narrow exceptions) as "all information about the Company or any of its subsidiaries or affiliates"—and only use it to assist in "evaluating and negotiating" Patriot's possible acquisition of Sierra.  (Ex. F-1.)  In addition, Patriot agreed not to contact any of Sierra's customers or suppliers without Sierra's prior written consent.  (Ex. F-1.)  The NDA is binding in perpetuity; Patriot does not dispute the binding nature of the NDA.  Nor can it be disputed that Sierra provided Patriot with volumes of confidential information under the NDA to facilitate acquisition negotiations.  (Exs. I-1; N-9; O-9.)

Sierra presented evidence that Patriot received, under the NDA, extensive information regarding Sierra's operations at McClellan Business Park.  (Ex. A-2; Trial Tr. Vol. 6, at 1036:8–1037:5.)  The NDA states as follows:

> "Confidential Information" means all information about the Company or any of its subsidiaries or affiliates furnished to Patriot Rail pursuant to this agreement or in connection with the Transaction by or on behalf of the Company, regardless of the form or manner in which such information is communicated to Patriot Rail, and all documents or materials prepared by or on behalf of Patriot Rail containing, based on, or generated or derived, in whole or in part, from any such information; provided, however, that "Confidential Information" does not include information that (1) was available to the public prior to the time of disclosure, (2) becomes available to the public through no act or omission by Patriot Rail, or (3) becomes available to Patriot Rail on a non-confidential basis from a third party Dot known or reasonably suspected by Patriot Rail to be under any obligation of confidentiality to the Company with respect thereto.

> Patriot Rail will hold the Confidential Information in confidence, will use it only to assist Patriot Rail in evaluating and negotiating the Transaction, and will not disclose any of it or any other information of any kind relating to the Transaction to any person or entity except (1) to Patriot Rail's directors, employees, officers, agents, advisors. or representatives who need such information for the purpose of evaluating and negotiating the Transaction (and such persons shall be informed by Patriot Rail of the confidential nature of the material and shall agree to hold the Confidential Information in confidence) or (2) as may be required by law in the reasonable judgment of Patriot Rail's counsel.

> . . .

> Patriot Rail further agrees that it will not contact any person with the Company or any customers or suppliers of the Company in connection with the Transaction without the Company's consent.

14

1    (Ex. F-1.)  The broad language in the NDA encompasses the information Sierra shared with

2    Patriot about key personnel at McClellan and the issues that were most important to McClellan

3    with respect to the shortline operations at the Park.  (Ex. A-2.)  Patriot conceded that it did not

4    know about the McClellan opportunity (or that McClellan even existed) prior to Sierra sharing

5    this information under the NDA.  (*See* Trial Tr. Vol. 10, at 1530:13–16; J. Marino Dep. 154:24–

6    155:11 (played to the jury on Mar. 21, 2014) (A. "No, I'm not familiar…I'm an East Coast guy."

7    Q. "I know, and you said it's a small operation, right?" A. "Yeah.").)   In fact, the only

8    information that Patriot obtained about McClellan prior to the RFP being issued was provided

9    under the protections of the NDA.  Thus, it was reasonable for the jury to conclude that Patriot

10   could not have determined that the McClellan operation was worth pursuing without improperly

11   using Sierra's information.  Such use was in contravention of the NDA, which precluded using it

12   for a purpose other than "evaluating and negotiating" Patriot's possible acquisition of Sierra.

13          Furthermore, the NDA is clear that Patriot was not permitted to contact Sierra's customers

14   without Sierra's permission (Ex. F-1), which means that Patriot could not contact McClellan

15   without Sierra's permission.  While Patriot had Sierra's permission to meet with McClellan for

16   the limited purpose of introducing Patriot as Sierra's financial partner, Patriot in no way had

17   Sierra's permission to contact McClellan in an effort to take business away from Sierra.  Paul

18   McCarthy ("McCarthy")[9] testified that Patriot was in competition with Sierra and that the sole

19   purpose of his visits and interactions with McClellan management and staff was to obtain the

20   McClellan contract for Patriot.  (Trial Tr. Vol. 12, at 1985:20–1986:2; 1994:25–1995:8 (Q. "Now,

21   in your understanding, why are you out there?" A. "I was there for Patriot, yep."… Q. "And, in

22   your mind, Sierra was a threat." A. "Absolutely.").)

23          Based on the evidence above, there was sufficient evidence before the jury to conclude

24   that Patriot breached the NDA.  Thus, Patriot cannot prevail in establishing a "complete absence

25   of probative facts to support the conclusion reached so that no reasonable juror could have found

26   for the nonmoving party."  *Eich*, 350 F.3d at 761 (internal quotations omitted).  As such, Patriot's

27   Rule 50(b) motion as to this cause of action is DENIED.

28   ─────────────────
       [9]        Paul McCarthy was employed by Patriot Rail and in charge of business development.

1      D.      Punitive Damages

2           Patriot makes numerous arguments in favor of granting a new trial on punitive damages.

3    For the reasons stated below, the Court finds that Patriot's arguments lack merit.

4           i.      *In Re Asbestos*

5           Patriot argues that the Court erred in allowing the jury to award punitive damages

6    pursuant to *In re Related Asbestos*, 566 F. Supp. 818 (N.D. Cal. 1983), because this case: (i)

7    immunizes Patriot from punitive damages because it is an innocent successor for practical

8    purposes; (ii) even if the practical successor aspect of the case is only a factor to consider in

9    awarding punitive damages, proper application of that factor forecloses punitive damages; and

10   (iii) at a minimum, the Court's failure to instruct the jury as to the *In re Asbestos* factor warrants a

11   new trial.  (ECF No. 535 at 8, 12.)

12          The plaintiffs in *In Re Asbestos* sought recovery of punitive damages against various

13   defendants, including a successor corporation, premised upon activities of the predecessor.  *Id.* at

14   819.  The district court, held that: (1) the fact that a successor corporation continued several of

15   predecessor's product lines did not justify imposition of punitive damages; (2) the successor

16   corporation was not a mere continuation of predecessor so as to allow imposition of punitive

17   damages under California law; and (3) pursuant to California statute, for a corporate employer to

18   be liable for damages based on acts of employee, a corporate employer must have ratified or

19   authorized wrongful conduct of employee.  *Id.*

20          The Court has already issued a ruling as to Patriot's arguments concerning the *In Re*

21   *Asbestos* case, (*see* Order, ECF No. 472), and found that these cases are not on point in light of

22   Patriot's concession that Patriot Rail Company LLC is a continuation of Patriot Rail Corporation,

23   and thus same entity.  (*See* Patriot's Response to Sierra' Supp. Brief, ECF No. 467 at 2:6–7

24   ("On careful evaluation of the facts and Delaware law, it has become clear that by operation of

25   Delaware law, PRC, LLC [Patriot Rail Company LLC] is in fact a continuation of Patriot Rail

26   Corp.").)   The facts of *In re Related Asbestos* would be more appropriately analogous if Sierra

27   wanted to impose liability upon SteelRiver as a successor in interest, a point which Patriot also

28   acknowledges.  (*See* ECF No. 467 at 11 ("the successor in In re Asbestos purchased all of the

16

1  outstanding shares of the predecessor (just like SteelRiver in this case. . . Under the [Stock

2  Purchase Agreement], SteelRiver bought all of the outstanding shares of Patriot Rail Corp. . . .

3  .").)  Accordingly, *In re Asbestos* is inapposite here, and the Court finds that Patriot was not

4  prejudiced by the Court's decision to not instruct the jury in accordance with this line of cases.

5       ii.     *Patriot's Argument that Sierra Made Improper Arguments that Tainted the Jury*

6            At the outset, the Court notes that Patriot's briefing includes two separate discussions of

7  alleged improper arguments—one concerning the punitive damages phase and another concerning

8  the liability phase—asserting that a new trial is required.  (*See* ECF No. 535 at 14–20, 27–30.)

9  The Court addresses the first section dealing with the punitive damages phase below.  The Court

10  has already addressed Patriot's argument concerning allegedly improper arguments concerning

11  Stan Wlotko and the Court's spoliation instruction that occurred during the liability phase in a

12  separate order.  (*See* Order Denying Patriot's Motion (ECF No. 452-1) for New Trial.)  As such,

13  the Court declines Patriot's invitation to revisit its ruling on said arguments.

14            a.     Sierra Did Not Urge the Jury to Punish Patriot for its Litigation Conduct

15            Patriot contends that the focal point of Sierra's closing argument was that Patriot should

16  be punished for their trial strategy.  (ECF No. 535 at 14–15.)  However, the Court curiously notes

17  that Patriot failed to object on such grounds during argument.  In fact the only objection offered

18  by Patriot during Sierra's closing argument was to Sierra's statement concerning funds that were

19  allegedly moved.  (*See* Trial Tr. Vol 18, at 2876:15–19 (Patriot objected to Sierra's statement:

20  "you heard testimony that within three days of the sale, 80 million was taken on a loan to

21  capitalize the company.").)[10]  During rebuttal, Patriot objected to Sierra's comment: "And their

22  case frankly subsisted of not really worrying about the facts and the law, but a concerted effort to

23  smear Mike Hart."  (Trial Tr. Vol. 18, at 2908:13–17.)  The Court overruled Patriot's objection

24  for two reasons: First, the Court found that Sierra's counsel's argument was a fair comment on

25  the evidence.  The statement was commenting on the weaknesses of Patriot's claims against

26  Sierra and was relevant to the first punitive damages factor, reprehensibility of Patriot's conduct.

27  Sierra's counsel was arguing that Patriot's claims against Sierra were meritless and that Patriot

28  ―――――――――
[10]        *See* Section III(D)(ii)(b) for a more detailed discussion of this objection.

was attempting to distract the jury from this fact by attacking Hart's credibility, which this Court found to be a fair comment on the evidence. Second, the attorney's closing statements are argument not evidence. The jury was instructed as such during the liability phase of this trial.[11] Thus, the Court finds that Sierra's argument does not warrant a new trial. *See Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 516–17 (9th Cir. 2004) ("A new trial should only be granted where the flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.") (internal quotations omitted).

        b.    <u>Alleged Suggestions Concerning the Siphoning of Funds to the Jury, or</u>
                <u>that the Jury Should Consider the Financial Condition of Non-Parties</u>

Patriot next argues that "virtually all aspects of Sierra's punitive damages case revolved around" alleged suggestions of improper "siphoning." (ECF No. 535 at 18:13–19.) In support, Patriot argues that Sierra implied siphoning to the jury by eliciting testimony that, three days after the June 18, 2012 sale to SteelRiver, Patriot Rail Company LLC took on $81.25 million in debt and distributed at least $80 million of the loan proceeds to its indirect parent, SteelRiver. (ECF No. 535 at 19:4-17.) However, the Court notes that Patriot allowed this testimony to come in without objection. (*See* Trial Tr. Vol 16, at 2505:5–2508:25.) Later, Patriot objected and then conceded that Sierra "ha[s] the right to explore the debt" but nevertheless expressed concern that jury could infer "siphoning." (Trial Tr. Vol 16, at 2541:23–2542:22.) In response, the Court stated:

> THE COURT: However, even by your own admission, he has to get into it to some extent. And that's why, if you notice, my first point that I raised after your argument was that there's going to be no evidence of siphoning.
>
> MS. LOVETT: Yes, Your Honor.
>
> THE COURT: Now, the explanation as to the things that are lacking -- what you're objecting to is the lack of an explanation, and I imagine you're going to give that explanation, but it certainly

---

[11] *See* Jury Instructions, ECF No. 442 at 7 (Instruction 5(1) reads as follows: "Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.")

1

has to round out the financial picture.  By presenting that evidence
without -- and I don't think he's going there and saying they're
siphoning off assets or siphoning off money.  That's not what he's
saying.  But you're trying to round out that picture.

2

3

MS. LOVETT: I understand that, Your Honor. And I didn't mean
to cut you off or presume to speak, but I will say that the reference
to Mr. Wlotko, which we know is -- I mean, they don't like him, I
think that's obvious.  They don't like Mr. Wlotko. They didn't
believe Mr. Wlotko.  So the picture that is there now -- and I'm
going to try to fix it, but the picture that is there now is that they
bought the company debt free, which they did -- it's like I go pay
off my car, and then somebody else comes to buy my car.  They
take on new debt, and maybe dad gives them a loan in the interim
before they get the loan. I'm being very simplistic with that, the
debt to equity structure.  But the impression when he says that they
paid that off so they could push that up to SteelRiver, and if they
hadn't pushed it up to SteelRiver, it would still be on your balance
sheet, then it leaves the jury with the impression, I think wrongly,
that the bad guy, Stan Wlotko -- and the Court instructed them to
disregard -- signed a loan so he could be in a Ponzi scheme with
SteelRiver and take 80 million dollars out of the new company. I
can try to fix that, but I want to alert the Court that to the extent I
don't think that's clear, if we make that evidence, I'm going to ask
the Court to instruct the jury to disregard any suggestion that that
money was improperly transferred to SteelRiver.

4

5

6

7

8

9

10

11

12

13

14

THE COURT: Well, we're certainly going to instruct the jury
they're not to consider any other entity other than the entities --
that's in the instructions. So we're going to instruct them, and
presumably they're going to -- they have to apply that instruction as
related to SteelRiver.  However, my impression of what counsel is
doing at this point is he's trying to give a complete picture of
Patriot Rail Company LLC, their financial picture, and you can't
get there unless you talk about SteelRiver to some extent.

15

16

17

18

19

MS. LOVETT: Your Honor, I do think that's absolutely correct,
and I'm not trying -- but my concern simply is that we're in
hypothetical territory.

20

21

(Trial Tr. Vol 16, at 2543:04–2545:04.)  The transcript shows not only that the Court thought that

22

the discussion was relevant, but also that Patriot's counsel conceded as such.  Moreover, it also

23

contradicts Patriot's argument that the Court gave jury instruction 4PD in an effort to cure

24

misconduct.  (ECF No. 535 at 14.)  The jury direction was not given to cure errors but just to

25

clarify that the jury could not consider the payments as wrongdoing.

26

       The following day, Patriot tried to inject the same siphoning argument and again the Court

27

held that Patriot's objection was unsupported:

28

THE COURT:  But the reality is Sierra hasn't made that argument.

19

They haven't made the argument about siphoning. I indicated that I would allow them to introduce evidence that would show the financial condition, and, quite frankly, the company's ability to pay -- make certain payments, for example, to pay off on this loan certainly speaks to their financial condition, whether or not they can pay off loans.

And that's what I was trying to get Sierra and pushing Sierra in the direction to explain to the Court how that $80 million is relevant. I now see how it is relevant. It's the same thing with this particular information. They're not talking about siphoning off funds. They are talking about their financial condition. This shows their overall financial condition.

Now, I haven't heard anything of anything [sic] that you're saying, siphoning off funds, trying to show, for example, that there is some improper purpose. I haven't heard that argument from them. I've heard it from you.

(Trial Tr. Vol 17, at 2722:03–20.)  Thus, the Court finds that Patriot's assertion that Sierra made improper siphoning arguments is unsupported by the record.

Patriot also complains about Sierra questioning Ms. Jennifer Whiteman ("Whiteman")[12] regarding payments she initiated to Marino ($208,000 each month) and a $2,500 per diem that the SPA obligated Patriot's new ownership to pay Bennet Marks ("Marks") for attending trial.  (ECF No. 535 at 19:18–28).  These questions were not improper and were in fact asked in an effort to rebut Patriot's narrative that, under new ownership and management, the company no longer had anything to do with the bad actors responsible for its tortious conduct.

Patriot next argues that the jury should have never heard testimony regarding the $20 million escrow account that was set aside to help cover Patriot's damages in this litigation.  (ECF No. 535 at 20:1–12.)  This money was earmarked to help pay the judgment in this case (Trial Tr. Vol 16, at 2616:24–2617:19) and thus is relevant to Patriot's ability to pay punitive damages. Although only about $4.2 million remained in this escrow account at the time of trial (Trial Tr. Vol 16, at 2619:6–17), eliciting testimony regarding the distribution of the remaining $15.8 million was relevant and appropriate for several reasons.  First, these facts were already in evidence in the SPA, which Patriot introduced.  (*See* Trial Ex. 440, at 59 (Art. 8.1(c)); Trial Tr. Vol., 15, at 2338:24–2339:19.)  Patriot failed to ask for this portion of the SPA to be redacted and

---

[12]    At the time of the trial Jennifer Whiteman was vice president of finance and accounting at Patriot Rail LLC.

20

1    is therefore estopped from objecting now.  *See Deland v. Old Republic Life Ins. Co.*, 758 F.2d

2    1331, 1336 (9th Cir. 1985) (the "invited error" doctrine estops a party from complaining of an

3    error for which it is responsible); *see also United States v. Segal*, 852 F.2d 1152, 1155 (9th Cir.

4    1988) ("[T]he invited error doctrine entitles [a party] to pursue inquiry into a matter, if evidence

5    thereon was first introduced by [the opposing party].").  Second, the distribution of the $15.8

6    million is relevant because it went to former Patriot management, undermining Patriot's argument

7    that "New Patriot" made a clean break with the individuals in charge of Patriot's intentional

8    wrongdoing.  Third, the distribution is also relevant because it was not intended to occur prior to

9    the trial in this case.  However, due to trial delays the trigger date for releasing the funds came to

10   pass and Patriot Rail Company LLC did not try to renegotiate that provision or prevent release of

11   the funds given the changed circumstance of the continued trial date.  (Trial Tr. Vol 17, at

12   2773:24–2774:23.)  In sum, none of the evidence cited in Patriot's motion was improperly

13   admitted.

14          Finally, even if this Court were to have erred in admitting evidence, the Court gave jury

15   Instruction 4PD to eliminate any possibility that the jury might consider the assets of non-parties

16   in awarding punitive damages, or infer wrongdoing based on transactions with non-parties:

17              You heard testimony about companies that are not parties to this
                case and payments made to those companies in 2012 and 2013. You
18              are instructed that there have been no claims in this case that Patriot
                Rail LLC, Patriot Rail Corporation or Patriot Rail Company LLC
19              engaged in any wrongdoing by making any payments to anyone,
                and you are not to infer any wrongdoing in this regard.   For
20              example, you may not consider distributions to SteelRiver from
                debt incurred by Patriot Rail Company LLC as being available to
21              pay punitive damages in this case as SteelRiver is not a party to this
                case and has not been found liable in this case.
22

23   (ECF No. 485.)  Moreover, in addition to Instruction 4PD, the Court instructed the jury at the

24   outset of its deliberations on punitive damages.  The Court instructed the jury that it could only

25   consider the financial condition of the parties subject to punitive damages and was prohibited

26   from considering the financial condition of "any other entity or individual."  (Trial Tr. Vol 18, at

27   2859:3–8; *accord* Jury Instruction No. 2PD (ECF No. 485).)  There is a strong presumption that

28   juries follow cautionary instructions, which can be overcome only if "there is an 'overwhelming

21

1    probability' that the jury will be unable to follow the court's instructions." *Greer v. Miller*, 483

2    U.S. 756, 766 n.8 (1987) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)).  Patriot has

3    presented no evidence that the jury was likely to disregard the Court's instructions.

4              iii.      *Patriot's Argument that the Jury Impermissibly Awarded Punitive Damages Based*

5                        *on a Negligence Theory of Liability*

6              Patriot next argues that the record does not support the jury's punitive damages award

7    because (1) the jury found Patriot liable for negligent interference and (2) insufficient evidence

8    supports its liability for intentional interference.  (ECF No. 535, at 21–24.)   The first argument

9    fails for a number of reasons.  First, the jury found that Patriot intentionally interfered with

10   Sierra's prospective economic advantage and that it did so with "malice, oppression, or fraud."

11   (ECF No. 447 at 6.)  Essentially, what Patriot is arguing is that the jury's finding of negligent

12   interference somehow negates its finding of intentional interference.  Regardless, Patriot waived

13   its objection to any inconsistency in the jury verdict.  The Ninth Circuit is clear: "When counsel is

14   invited to consider whether or not to discharge the jury, counsel risks waiver of objections to any

15   inconsistencies in the jury's findings if counsel does not raise the issue before the jury is

16   excused." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 133 (9th Cir. 1995).

17   Here, Patriot did not object after the jury's liability verdict, even though the jury was not excused

18   until five weeks later, and even though the Court "invited [counsel] to consider whether or not to

19   discharge the jury" before doing so.  (Trial Tr. Vol. 19, at 2921:5-11.) Accordingly, Patriot's

20   objection is waived as untimely.

21             Moreover, a plain reading of the jury instructions for intentional and negligent

22   interference shows the claims are not mutually exclusive.  (*See* Jury Instructions Nos. 43–45, ECF

23   No. 442.)  This jury found that Patriot acted intentionally and that it did so with malice,

24   oppression, or fraud.  As such, one could logically conclude that Patriot's actions also met the

25   elements for negligent interference and thus, Patriot could have been liable on either a theory of

26   negligent or intentional interference.  For example, the jury could find that Patriot "knew or

27   should have known" of Sierra's economic relationship with MBP because it "knew" of the

28   relationship and acted intentionally thus failing "to act with reasonable care."  *See id.*  To

                                                        22

1  conclude the opposite—that Patriot did act with reasonable care in light of the jury's intentional

2  interference finding—would have been irrational.  In these circumstances, the proper remedy is

3  not vacatur or remittitur of the jury's punitive damages award, as Patriot assumes without citing

4  any authority.  Rather, the proper remedy would be to disregard the negligence finding as

5  "surplusage" and uphold the jury's award.  *Martinez v. Martinez*, 41 Cal. 2d 704, 705–06 (1953)

6  (holding that an inconsistency in a judgment is immaterial where "there is sufficient evidence to

7  support a judgment for plaintiff on either theory"); *see also Zhang*, 339 F.3d at 1035 ("We have

8  found no Supreme Court or Ninth Circuit cases in which an appellate court has directed the trial

9  court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit

10  precedent dictates that we cannot do so.").

11      As to Patriot's second argument, this Court has already found that the jury's verdict that

12  Patriot intentionally interfered with Sierra's prospective economic advantage, is supported by the

13  record.[13]

14      *iv.*    *Patriot's Argument that the Punitive Damages are Unconstitutional*

15      Patriot also claims the jury's punitive damages award is constitutionally excessive.  (ECF

16  No. 535 at 24–27.)  The main theme of Patriot's briefing is that there is insufficient evidence of

17  reprehensibility to support the jury's award.

18      "Only when an award can fairly be categorized as grossly excessive in relation to these

19  interests does it enter the zone of arbitrariness that violates the Due Process Clause of the

20  Fourteenth Amendment.  For that reason, the federal excessiveness inquiry appropriately begins

21  with an identification of the state interests that a punitive award is designed to serve."  *BMW of N.*

22  *Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (internal citations omitted).  Courts consider three

23  "guideposts" when reviewing the constitutionality of punitive damages awards: the degree of

24  reprehensibility; the disparity between the harm or potential harm; and the difference between the

25  remedy and the civil penalties authorized or imposed in comparable cases.  *Id.* at 574–75.

26  Patriot's briefing addresses one: "the degree of reprehensibility of the defendant's conduct."

27

28  [13] *See* Section III(A) for an in depth discussion as to the evidence supporting the jury's verdict on Sierra's intentional interference claim.

1    Courts look for the presence of one or more of the following aggravating factors when

2    weighing the reprehensibility of a wrongdoer's conduct: (1) the harm was physical rather than

3    economic; (2) the misconduct evinced an indifference to the health or safety of others; (3) the

4    target of the conduct was financially vulnerable; (4) the conduct was repeated and not an isolated

5    incident; and (5) the harm was the result of intentional malice, trickery, or deceit, and not mere

6    accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Here, Patriot

7    asserts that there is no evidence to support any of these reprehensibility factors. This Court

8    disagrees. Because the harm in this situation is economical, the first two aggravating factors are

9    not applicable to this case. As such, the Court declines to address these factors and moves first to

10   the fifth factor followed by the fourth, then the third.

11       a.    The Harm was the Result of Intentional Malice, Trickery, or Deceit

12   Sierra satisfied the central element of the intentional interference tort—the independently

13   wrongful act element—by proving the elements of civil fraud. (*See* Jury Instructions Nos. 43–44,

14   46–48.) Sierra presented evidence that both Marino and Wlotko lied to Hart about their

15   intentions at MBP and took actions in furtherance of those lies. (Trial Tr. Vol 6, at 1040:24–

16   1043:10; Trial Tr. Vol 7, at 1058:1–1061:15.) They told Hart in August 2007 that any proposal

17   Patriot submitted would be a "second bite at the apple" on behalf of Sierra (Trial Tr. Vol 7, at

18   1058:12–14; 1060:20–24) and that there was "absolutely no way" Patriot would take any action at

19   MBP without Sierra because the NDA prohibited it. (Trial Tr. Vol 6, at 1041:24–1042:5.) In

20   fact, Marino even convinced Sierra to lower its capital investment offer to MBP from $1–$1.2

21   million to $500,000 because it was "too high" and would "cost [Sierra] in the purchase price" that

22   Patriot would purportedly pay. (Trial Tr. Vol 7, at 1059:6–14.) Patriot then turned around,

23   submitted a bid on its own behalf, and offered MBP a $1 million capital investment. (Trial Ex. Z-

24   3.) The Court finds that these facts are sufficient to show trickery or deceit. Moreover, this

25   conduct was repeated.

26       b.    The Conduct was Repeated and Not an Isolated Incident

27   Wlotko and Marino separately both lied to Hart, and Marino followed it up by

28   purposefully deceiving Hart into lowering Sierra's capital investment offer to enable Patriot to

1    win the bid. Patriot never retracted or corrected these misrepresentations, even after submitting

2    its bid on its own behalf. (Trial Tr. Vol 7, at 1083:17–1084:15.) McCarthy testified that Patriot

3    viewed Sierra as a "threat" and Patriot's target was now to take the MBP contract for itself. (Trial

4    Tr. Vol 12, at 1950:20–23; 1953:4–5; 1985:20–1986:2; 1995:7–8.) Thus, this Court found that

5    "Patriot's conduct involved repeated misrepresentations to Sierra." (Order, ECF No. 522 at 8.)

6                    c.        The Target of the Conduct was Financially Vulnerable

7            Patriot also tries to sidestep the considerable evidence that it preyed on Sierra's financial

8    vulnerability by claiming that Patriot only played "hardball" with negotiations and that this

9    evidence is legally irrelevant to Sierra's intentional interference claim. (ECF No. 535 at 26:1–

10   21). This Court disagrees. The "financial vulnerability" factor is satisfied whenever the plaintiff

11   is financially vulnerable; there is no separate requirement that the defendant targeted the plaintiff

12   because of its vulnerability as part of the claim giving rise to punitive damages. *See, e.g., Bains*

13   *LLC v. Arco Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005). In any event, the main reason the

14   parties began negotiations in the summer of 2007 was that Sierra needed financial backing to

15   renegotiate a long-term contract with MBP. (Trial Tr. Vol 6, 997:22–998:6; 1030:22–1033:10.)

16   After obtaining Sierra's financials, Patriot decided MBP was a more promising target than Sierra.

17   It made a low-ball offer of $7.2 million for Sierra on September 10, 2007, which non-party

18   witness Carl Daucher interpreted as preying on Sierra's financial need. (Daucher Depo. 175:24–

19   176:7 (played for the jury on March 25, 2014, *see* Trial Tr. Vol 12, at 2030–2131).) When the

20   negotiations failed, Patriot resorted to taking MBP for itself, knowing this would leave Sierra

21   financially devastated and desperate to sell. (*See* Hart's description of the importance of the MBP

22   contract to the company at Trial Tr. Vol 7, at 1115:17–18.)

23           The Court finds that these factors support the punitive damage award and thus finds the

24   award to be within the constitutional limits.

25   ///

26   ///

27   ///

28   ///

1

**IV.     CONCLUSION**

2

     For the foregoing reasons, Patriot's motion for Judgment as a matter of law or

3

alternatively motion for new trial as to the jury's punitive damages award (ECF No. 535) and

4

Patriot's Rule 50(b) motion (ECF No. 536) are hereby DENIED.

5

     IT IS SO ORDERED.

6

7

Dated:  August 5, 2015

8

9

                                     _____

Troy L. Nunley

United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26